David L. MURTISHAW, Petitioner–Appellant,

v.

Jeanne WOODFORD, Warden of the California State Prison at San Quentin, Respondent–Appellee.

No. 98–99018.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1999

Filed June 26, 2001

David H. Schwartz, San Francisco, California, for the appellant.

Susan Rankin Bunting, Deputy Attorney General, Sacramento, California, for the appellee.

Before: HUG, FERGUSON and WARDLAW, Circuit Judges.

HUG, Circuit Judge:

Petitioner David Murtishaw, a California death row inmate, appeals the district court's denial, on the merits and after an evidentiary hearing, of his habeas corpus petition challenging: 1) his 1979 conviction for three counts of first degree murder and one count of assault with attempt to commit murder; and 2) his 1983 sentence of death. We conclude that the district court properly denied Murtishaw's claims with regard to his conviction of murder; however, the district court erred in denying one of Murtishaw's claims with regard to his death sentence. Accordingly, we affirm in part, reverse in part, and remand.

## FACTS

On the morning of April 9, 1978, Lance Buflo, his wife Martha Soto, and his friends Ingrid Etayo and James Henderson traveled to the desert near Mojave, California. Their goal for the day was to film a student movie for Buflo's cinema class at the University of Southern California. The students arrived in the desert and began filming the movie at about noon.

Meanwhile, on that same morning, Murtishaw and his brother-in-law Greg Laufenburger decided to go to the desert to shoot two .22 caliber rifles belonging to Murtishaw and his wife's ex-husband. At about 10:00 a.m., the two men left Murtishaw's house, purchased 500 cartridges of ammunition and two six-packs of beer, and left for the desert. After a few hours of traveling, Murtishaw and Laufenburger reached the town of Mojave. They stopped briefly to buy another six-pack of beer, because they had already consumed the beer that they bought earlier, and then they turned down a dirt road and drove into the desert.

While Murtishaw and Laufenburger were driving along the dirt road, their car stalled. They both repeatedly tried to re-start the car, but their efforts were ultimately unsuccessful. Apparently frustrated with the car, the two men decided to start shooting their rifles. At one point, Murtishaw shot at, and hit, a full can of beer that he had placed on the hood of the car, and he later shot at the car itself several times.

A short while later, Murtishaw and Laufenburger started to walk down the dirt road further into the desert, where they soon encountered Buflo, Soto, Henderson and Etayo, who were busy filming their movie.[1] Murtishaw explained to Buflo that

---

1. The plot of the movie is ironic when compared to the facts of this case. In the movie, a man, played by Henderson, is stranded in the desert due to car failure. He grows pro-gressively weaker and is confronted by a hooded figure, played by Soto, who symbolizes death. In one of the scenes, Henderson shoots at the hooded figure several times (the

his car had broken down, and he asked Buflo for a ride back to town. Buflo explained to Murtishaw and Laufenburger that he and the other students were filming a movie, and he agreed to give the two men a ride when they had finished, which would be later in the day. Murtishaw and Laufenburger thanked Buflo and began walking back toward their stranded car.

When Murtishaw and Laufenburger returned to their car they tried again, unsuccessfully, to restart it. According to Laufenburger's testimony, it was at this time that Murtishaw's intentions toward the students first turned sinister. Apparently, Murtishaw wanted to steal the students' car, and he repeatedly said to Laufenburger, "let's shoot the people," or "something like that." Laufenburger, thinking that Murtishaw was joking, dismissed his comments.

Later in the afternoon, Martha Soto and Ingrid Etayo left the other two students and drove into town in Buflo's car to get some lunch for the four of them. As they passed Murtishaw and Laufenburger near Murtishaw's car, the two men flagged down the women to ask them for a ride. Soto and Etayo responded that they were not going into town, and they continued driving.

After Etayo and Soto continued down the dirt road into town, Murtishaw and Laufenburger walked back to where Buflo and Henderson were still filming in order to watch them. Uncomfortable with his new audience, Buflo went to talk with Murtishaw and Laufenburger. He observed that Murtishaw smelled strongly of alcohol and that he was using profanity. Sometime during the conversation, at Murtishaw's invitation, Buflo took a drink of Murtishaw's beer and fired a shot from Murtishaw's rifle. Buflo then began pre-

paring for the next scene in the movie, which required the use of a .38 caliber revolver loaded with blanks. Murtishaw observed Buflo handling and loading the revolver, which Buflo had rented specifically for the movie, but it is unclear whether Murtishaw knew that the revolver was loaded with blanks. Murtishaw watched from about forty or fifty feet away as Buflo and Henderson resumed filming. Henderson fired the .38 caliber revolver several times during the scene.

A short while later Murtishaw and Laufenburger again approached Buflo to ask him for a ride. Buflo assured them that he would give the two a ride when they finished filming, at which point Murtishaw and Laufenburger decided to walk to the main road to see if they could hitch a ride into town.

Soto and Etayo soon returned in Buflo's car with the lunch they had bought in California City. After they ate lunch, the students filmed the final scene using the revolver, and then placed the empty gun in a satchel.

Meanwhile, Murtishaw and Laufenburger returned to their car and again tried to start it. By this time Murtishaw's intentions had become clear to Laufenburger: as Laufenburger testified, Murstishaw "kept on saying 'Let's shoot them. Let's shoot them,'" to which Laufenburger responded "No." Murtishaw then told Laufenburger to wait there, and Murtishaw started to walk back to where the students were filming their movie.

At about this time the shadows were growing too long to continue filming, and the students decided to stop for the day. As they packed up their equipment, Henderson carried the satchel containing the .38 caliber revolver to the trunk of

---

students used a .38 caliber revolver loaded with blank cartridges), but is unable to harm

it. Eventually, the stranded man succumbs to the hooded figure and dies.

Buflo's car. Henderson returned to help Buflo and Soto with the rest of the equipment, and as the three were walking back to Buflo's car two or three shots rang out from behind them.[2] Henderson yelled out "I've been shot." Buflo saw that Henderson's shirt was covered with blood, and he dropped the things he was carrying to help Henderson.[3] Buflo, Henderson, and Etayo managed to make it around to the passenger's side of the car before Murtishaw fired again, but a second volley of shots hit Soto in the head as she was scrambling for cover. The shooting then stopped momentarily, and Buflo and Henderson dragged Soto around to the passenger's side of the car before the shooting resumed. Soto was vomiting, and Buflo took the hooded robe she was wearing and placed her head upon it.

During another pause in the shooting, Buflo and Henderson searched frantically for the keys to the car, but their efforts were unsuccessful. The shooting began again, and Buflo, Henderson and Etayo again sought refuge on the passenger's side of the car, where Soto was lying. Henderson decided that someone would have to go for help if any of them were going to survive, and he sprinted from behind the car. Murtishaw fired five or six more shots at Henderson. These shots struck Henderson in the back, killing him.

Buflo and Etayo were still behind the passenger's side of the car when Murtishaw shot and killed Henderson. After Henderson fell to the ground, Buflo looked underneath the car and saw Murtishaw raise his head up from behind a bush, take aim at Buflo, and fire. One of the shots hit Buflo in the hand. Buflo and Etayo then decided that their best chance for escape was to run from Murtishaw. Buflo sprinted from behind the car, and he successfully ran at least 150 feet from the car before he tripped and fell. He turned around to see Murtishaw approaching Etayo. Buflo then ran another 150 feet, and turned again to see what became of Etayo. He saw Murtishaw standing over Etayo, who was still kneeling beside Soto. He heard Murtishaw yell something at Etayo, and as he turned again to run, he heard several more shots. Those shots killed Etayo.

Buflo made his way to the highway and flagged down a young couple in a van to give him a ride to town. On his way into town Buflo saw Murtishaw and Laufenburger hitchhiking on the highway.

Laufenburger's and Murtishaw's account of the Etayo shooting differs slightly from Buflo's. Laufenburger testified that he lay down behind a bush when Murtishaw started shooting, but that he could see both Murtishaw and the car. He then saw "one of the girls" (Etayo) walk out towards Murtishaw, and he heard Murtishaw tell her "Stop or I'll shoot." Laufenburger heard Etayo pleading for Murtishaw to stop, and Laufenburger told Murtishaw to "stop shooting," which he did for a moment. Laufenburger asked Murtishaw if he was going to shoot him, to which Murtishaw replied "No." Laufenburger then ran back toward Murtishaw's car, and as

---

2. Murtishaw initially claimed that he heard two shots from the direction of the students and, believing that someone was shooting at him, shot back at the students. The district court found no evidence in the record, nor alleged in the habeas corpus petition, to support that claim.

Laufenburger testified that he did not see the initial volley of shots, but that he heard "a few shots" just after Murtishaw left him at their car. Laufenburger then began walking toward Murtishaw and the students, and he saw Murtishaw begin shooting "a whole bunch" of shots at the students.

3. Murtishaw contends that during this time Laufenburger yelled for Buflo and the students to throw out their gun, but both Buflo and Laufenburger denied this account.

he was running he heard Murtishaw shoot several more times. Murtishaw's account of the Etayo shooting agrees substantially with Laufenburger's.

After Murtishaw had shot Etayo, he ran to catch up with Laufenburger. The two men threw away their guns and remaining ammunition, and they started back toward the highway. Laufenburger and Murtishaw walked to Mojave and hitched a ride to Sylmer. They met their wives at a restaurant in Sylmer later that night. On the way home Murtishaw told his wife that his car had been stolen and that he had shot three people.

The next day Murtishaw, with the help of his brother, turned himself in to the Norwalk police. He was read his Miranda rights, and he agreed to talk to the investigators. When the police arrived at the scene of the shooting they found that Henderson and Etayo were dead. Soto died from the gunshot wound to her head two days later. All of the victims died from wounds from a .22 caliber rifle, which ballistics tests confirmed was Murtishaw's gun.

Both Murtishaw and Laufenburger were charged with three counts of first degree murder and one count of assault with intent to commit murder. Both pled not guilty. The charges against Laufenburger were dropped before the preliminary hearing.

Murtishaw's guilt trial on the three counts of first degree murder and one count of assault with attempt to commit murder began on January 2, 1979. The jury returned a verdict of guilty on all four counts on January 25, 1979. Following a penalty trial, the same jury returned a verdict of death on February 6, 1979, and the trial court issued an order of execution on April 27, 1979.

In *People v. Murtishaw*, 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446 (Cal.1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280,

71 L.Ed.2d 464 (1982) (hereinafter *Murtishaw I* ), the California Supreme Court affirmed Murtishaw's guilt conviction, but reversed his sentence of death. A second sentencing trial began on December 1, 1982, which resulted in a verdict of death on February 11, 1983. The California Supreme Court affirmed the death penalty verdict in *People v. Murtishaw*, 48 Cal.3d 1001, 258 Cal.Rptr. 821, 773 P.2d 172 (Cal. 1989), *cert. denied*, 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 764 (1990) (hereinafter *Murtishaw II* ).

On October 21, 1991, Murtishaw filed a petition for a writ of habeas corpus with the United States District Court for the Eastern District of California. The district court, in an order on March 27, 1992, held the petition in abeyance pending exhaustion of all of Murtishaw's claims in state court. After exhausting all of his state court remedies, Murtishaw filed an amended petition for a writ of habeas corpus with the district court on October 14, 1992. On August 21, 1996, the district court issued an order that: 1) ruled that all claims had been properly exhausted; 2) found possible prejudice on two of Murtishaw's claims (relating to ineffective assistance of counsel); 3) granted an evidentiary hearing on those claims; and 4) denied the remainder of Murtishaw's claims. The district court also held that two of Murtishaw's claims had been procedurally defaulted.

The district court held its evidentiary hearing on the ineffective assistance of counsel claims on May 6–7, 1997. Following the hearing and briefing by the parties, the district court issued a Memorandum Decision and Order that: 1) reversed its previous findings of procedural default; 2) denied the remaining claims in the habeas corpus petition; and 3) denied a certificate of probable cause. The district court entered a final judgment on April 2, 1998.

## JURISDICTION

The district court had jurisdiction over Murtishaw's petition pursuant to 28 U.S.C. § 2254, and it entered a final judgment on April 2, 1998. Murtishaw filed a timely notice of appeal on April 30, 1998. This Court granted Murtishaw's application for a certificate of probable cause on October 13, 1998. Recently, however, the Supreme Court decided that the provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–122, 100 Stat. 1214 ("AEDPA") regarding the issuance of a certificate of appealability ("COA") as a predicate to review in the court of appeals apply to all cases in which the notice of appeal was filed after AEDPA's effective date, regardless of whether a certificate of probable cause has already been issued. *See Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000). Murtishaw's appeal falls within this category of cases. Therefore, consistent with *Slack,* we treat Murtishaw's notice of appeal in this case as an application for a COA. *See id.; Schell v. Witek,* 218 F.3d 1017, 1021 n. 4 (9th Cir.2000) (en banc). We conclude that Murtishaw has made the requisite "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and we grant the COA and exercise jurisdiction over these issues pursuant to 28 U.S.C. § 2253 and Rule 22 of the Federal Rules of Appellate Procedure.[4]

## STANDARD OF REVIEW

We review de novo a district court's denial of a petition for habeas corpus. *See Bean v. Calderon,* 163 F.3d 1073, 1077 (9th Cir.1998); *Smith v. Stewart,* 140 F.3d 1263, 1268 (9th Cir.1998). "However, findings of fact made by the district court relevant to the denial of [petitioner's] habeas corpus petitions are reviewed for clear error." *Bonin v. Calderon,* 59 F.3d 815, 823 (9th Cir.1995), *cert. denied,* 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996).

## DISCUSSION

## I. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Ineffective assistance of counsel ("IAC") claims involve a two-part inquiry. First, the defendant must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Campbell v. Wood,* 18 F.3d 662, 673 (9th Cir.1994) (en banc) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (internal quotation marks omitted). The defendant is entitled only to " 'reasonably effective assistance,' " *id.* (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052), and the ultimate question is whether counsel's representation " 'fell below an objective standard of reasonableness.' " *Id.* (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). In determining whether the defendant received effective assistance of counsel, we "will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight," *id.,* but rather, will defer to counsel's sound trial strategy. *See id.* The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy. *See* Strickland, 466 U.S. at 689, 104 S.Ct. 2052.

---

4. We note, however, that even though the provisions of the AEDPA apply to the issue of whether Murtishaw is entitled to a certificate of appealability, pre-AEDPA law applies to the merits of the habeas petition because Murtishaw filed his petition in district court before the effective date of the AEDPA. *See Slack v. McDaniel,* 529 U.S. 473, 481–82, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Bean v. Calderon,* 163 F.3d 1073, 1077 (9th Cir.1998).

■ Second, even if counsel's actions " 'fell below an objective standard of reasonableness,' " *Campbell,* 18 F.3d at 673 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052), the defendant must show that " 'the deficient performance prejudiced the defense.' " *Id.* (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). To demonstrate prejudice, the defendant has the burden of proving that "there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Bonin,* 59 F.3d at 833 (quoting *Wade v. Calderon,* 29 F.3d 1312, 1323 (9th Cir.1994)); *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Thus, in order to determine whether counsel's errors prejudiced the outcome of the trial, "it is essential to compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Bonin,* 59 F.3d at 834.

## A. Facts Underlying Murtishaw's Representation at the Guilt Trial

### 1. Representation by Andrew Feringa

Murtishaw's father retained Mr. Andrew Feringa to serve as Murtishaw's counsel on April 11, 1978, two days after the shooting incident, and one day before Murtishaw's arraignment.[5] Feringa met with Murtishaw for 15 minutes before his arraignment on April 12, 1978, and he entered a plea of not guilty for Murtishaw at the arraignment. Following the arraignment, Murtishaw told Feringa that he had been drinking on the day of the incident, and that he had used PCP earlier in the week. Murtishaw also told Feringa that he believed someone had been shooting at

him when he opened fire, and that a dark figure was coming at him.

Feringa considered having Murtishaw give blood or urine samples when he first interviewed Murtishaw. But, believing that alcohol remained in the body for 24 to 36 hours, and that narcotics remained in the body for 72 hours, Feringa concluded that such tests would not be of much value, because it had already been three days since the shooting incident.

Murtishaw pled not guilty at his arraignment in Superior Court on May 5, 1978. On that same day, Feringa filed a motion for confidential funds for an investigator and psychiatric experts, which was granted to the extent of $1,750.

Feringa used the funds to hire an investigator named Herbert Dodd, a psychiatrist named Dr. Selwyn Rose, M.D., and a psychologist named Dr. Michael Maloney. His choice of Dr. Rose and Dr. Maloney was based on conversations he had with public defenders in Los Angeles who had handled death penalty cases in the past.

Dr. Rose and Dr. Maloney examined Murtishaw. Dr. Rose concluded that Murtishaw was "sane at the time of the commission of the alleged offense." However, Dr. Rose was unaware of the Murtishaw family's mental and dysfunctional history. Dr. Rose did note that Murtishaw claimed to have been severely intoxicated at the time of the shooting, but also noted that "there are several factors which are not consistent with the defendant being severely intoxicated," and concluded that Murtishaw "at the time of the commission of the alleged offense [had] the mental capacity to form the specific intent to kill." Likewise, Dr. Maloney found no evidence to suggest that Murtishaw "suffered any

---

5. Murtishaw's brief alleges that Feringa was retained on April 10, one day after the shooting. However, the district court evaluated

evidence to the contrary, and concluded that the "evidence establishes [that] April 11, 1978 is the date Mr. Feringa was retained."

deficit in his ability to form a specific intent to commit murder or to premeditate." Further, Murtishaw's performance on the Bender Visual Motor Gestalt Test, administered by Dr. Maloney, counterindicated any organic brain dysfunction.

Feringa was not satisfied with Dr. Rose's and Dr. Maloney's reports, and he still suspected that Murtishaw was legally insane at the time of the shooting. Based on this belief, and based on his initially erroneous belief that pleading not guilty by reason of insanity ("NGI") would provide access to confidential court-appointed psychiatrists, Feringa entered an NGI plea on July 13, 1978.

Following the NGI plea, Judge Paul Borton appointed two psychiatrists, Dr. Francis Matychowiak and Dr. Richard Burdick, and explained to Feringa that their reports would be available to both the court and the prosecution. Even though Feringa understood that the reports would not be confidential, he decided to maintain the NGI plea because he believed it had merit. Feringa also decided at this time not to seek additional confidential funds because, even though he believed they would be granted, he was looking for another counsel to take over the case.

The reports from the court-appointed experts, Dr. Matychowiak and Dr. Burdick, each determined that Murtishaw was both sane and competent to stand trial. Both psychiatrists discussed Murtishaw's PCP use, including the use on the night before the shooting, and neither believed that he was influenced by PCP during the shootings.

Following Dr. Matychowiak's and Dr. Burdick's reports, Feringa sought appointment of a third psychiatrist to evaluate Murtishaw. The court appointed Dr. Phillip Kelly, who had a favorable reputation among the local criminal defense bar. On the same day that Dr. Kelly was appointed, Feringa sought additional confidential funds, and he was granted an additional $3,250. However, the following week a newspaper reported that Feringa had now been authorized $5,000 for Murtishaw's defense, and because of this publicity Feringa believed that obtaining future confidential funds "would be like pulling teeth."

Dr. Kelly returned his report on September 5, 1978. In the report he diagnosed Murtishaw as having had "a fugue state with disorientation and confusion at the time of the present episode." This diagnosis led Dr. Kelly to believe that Murtishaw's actions were "ego alien" and that they did not "fit with any idea of premeditation." The report did not attribute Murtishaw's actions to alcohol or PCP intoxication, even though Dr. Kelly was plainly aware that Murtishaw had been drinking on the day of the incident.

On September 1, 1978, Feringa noticed a motion to transport Murtishaw to Los Angeles for an alcohol-induced EEG to be performed by Dr. Carrol Ramseyer. Feringa intended to pay for this EEG out of the confidential funds previously approved by the court. On September 11, 1978, the court granted Feringa's motion for an alcohol-induced EEG, but required that the EEG take place in Bakersfield. Feringa took no further steps to obtain an EEG, as he substituted out of the case on September 14, 1978.

Before he substituted out of the case, Feringa contacted two other experts: Dr. Leon Marder, an expert on PCP; and Dr. Michael Coburn. Dr. Coburn examined Murtishaw, but Feringa asked him not to prepare a report. Dr. Marder never examined Murtishaw, but Feringa had communicated his contact with Dr. Marder to Mr. James Faulkner, who took over the case for Feringa.

## 2. Representation by James Faulkner

Mr. James Faulkner took over as counsel for Murtishaw after consulting with Murtishaw's father, and after learning that Feringa no longer wanted to continue with the case. Faulkner took the case at a significant discount for two reasons: first, the case was interesting, and he hoped to be involved in future cases of this type; and second, he hoped to embarrass the district attorney, Mr. Leddy, who had recently defeated Faulkner in an election for district attorney. After Faulkner took the case, the trial (which was originally scheduled for September 18, 1978) was continued to November 27, 1978.

Faulkner did not believe that the trial was winnable at the guilt phase, and he took the case "to see if he could save Murtishaw's life." Faulkner did think that Dr. Kelly's report of the "fugue state" raised the possibility of a diminished capacity defense, but that it would be a "weak defense." Faulkner also contacted an expert in the field of PCP, Dr. Lerner, to discuss with him the possibility of a PCP-intoxication defense. Dr. Lerner, however, was too busy to help on the case, and he instead forwarded Faulkner some literature. Faulkner decided not to pursue the PCP defense, because he believed that such a defense would fail for several reasons: 1) the likely jury pool in Kern County would not be susceptible to such a defense; 2) he had known of other cases in which a narcotic diminished capacity defense had been unsuccessful; and 3) he believed the PCP defense would not be successful without scientific and physical evidence of intoxication.

Faulkner made no formal requests for additional confidential funds, but instead used the $1,800 balance that was left from Feringa's requests. Faulkner read all the transcripts of Feringa's requests for confidential funds, and presumed that any further requests would be denied.

As he prepared the defense and reviewed the reports by Dr. Rose and Dr. Maloney, Faulkner concluded that there was no basis for an insanity defense. Nevertheless, Faulkner did not withdraw the NGI plea, but instead requested additional medical examinations and additional opinions to determine whether Murtishaw met California's new insanity standard as established by People v. Drew, 22 Cal.3d 333, 149 Cal.Rptr. 275, 583 P.2d 1318 (1978) (holding that the A.L.I. standard for insanity then applied in California, rather than the older M'Naghten rule).[6] Faulkner kept the NGI plea in place because he thought the additional medical examinations could help in the penalty phase and possibly lead to something that would substantiate the NGI plea, and because he thought the NGI plea would keep the prosecution off balance. Faulkner sought, and was granted, another continuation of the trial.

On November 17, 1978, the prosecution requested that Murtishaw undergo an alcohol-induced EEG, under the supervision of Dr. Badgley, who practiced with Drs. Matychowiak and Burdick (who had already produced reports unfavorable to Murtishaw). Faulkner did not believe Dr. Badgley would be a good defense witness, but he nonetheless consented to the EEG because he thought that an EEG would be helpful, and because he thought that he could not get an out-of-town EEG, based on the court's previous denial of Feringa's motion to have a doctor in Los Angeles perform the EEG. After the EEG, Dr. Badgley told Faulkner that Murtishaw had some brain damage, but that the EEG was within the normal limits. Faulkner did not

---

6. Drew was superceded by statute reinstating M'Naghten. People v. Skinner, 39 Cal.3d 765, 768–69, 217 Cal.Rptr. 685, 704 P.2d 752 (1985).

have another expert review the EEG results.

On December 8, 1978, the prosecution moved to have Dr. Ronald Siegel, a psychopharmacologist, examine Murtishaw, subject to his consent, to determine whether he was under the effects of PCP at the time of the shooting. Before consenting, Faulkner investigated Dr. Siegel and obtained favorable opinions of him from local defense attorneys. Based on these reports, Faulkner consented to the examination.

Dr. Siegel's report was not favorable to Murtishaw. It included opinions that Murtishaw was assaultive, violent, and capable of little impulse control.[7] Dr. Siegel also found that Murtishaw "did not always maintain a firm grip on reality," which was a temporary condition resulting from hallucinogenic experiences that were probably related to Murtishaw's drug history. Dr. Siegel, however, did not believe that Murtishaw experienced any of the "classic signs of PCP intoxication or psychosis" at the time of the shooting.

Faulkner did not have another PCP expert examine Murtishaw because he believed he would be unable to obtain funds for another expert. Faulkner did not try to obtain additional funds, but instead based this conclusion on his experience that the Kern County Court had a "double standard" that precluded him from obtaining another out-of-county expert.

On January 2, 1979, the day of the trial, Faulkner, complaining that the NGI plea jeopardized the diminished capacity defense, moved to withdraw the NGI plea and to preclude testimony based on the NGI defense. At the trial the prosecution presented expert testimony from Dr. Matychowiak and Dr. Burdick relating to Murtishaw's mental state at the time of the shooting. They opined that Murtishaw was able to intend to kill, to premeditate, and to deliberate, and they both rejected the "fugue state" theory advanced by Dr. Kelly. Dr. Siegel testified for the prosecution that, in his opinion, Murtishaw's conduct was not the result of PCP use, and that Murtishaw was capable of premeditation at the time of the killing. Dr. Kelly was the only witness called by Faulkner at the guilt trial. Dr. Kelly testified that, in his opinion, Murtishaw experienced a fugue state at the time of the killing.

## B. Failure to Investigate and Present a Diminished Capacity Defense

Murtishaw argues that Feringa and Faulkner provided ineffective assistance when they failed to investigate and present fully a diminished capacity defense based on PCP or alcohol intoxication or brain disorders. He bases these arguments on six claims: 1) Feringa's failure to obtain blood samples; 2) Feringa's delay in obtaining mental health experts; 3) Feringa's failure to notify the mental health experts of Murtishaw's family history of psychological problems; 4) Feringa's and Faulkner's failure to retain a new confidential mental health expert after Dr. Rose; 5) Faulkner's failure to have a confidential EEG performed; and 6) Faulkner's failure to obtain a confidential PCP expert.

### 1. Failure to obtain blood samples.

Murtishaw first contends that Feringa's representation was constitutionally deficient because he failed to obtain a

---

**7.** Dr. Siegel testified at Murtishaw's first penalty trial that Murtishaw was violent, assaultive, and combative, and that he could become similarly violent in the future and repeat his homicidal tendencies because he had little ability to restrain himself. The California Supreme Court found this testimony to be unreliable, and it was this testimony that caused the California Supreme Court to reverse the first death penalty sentence. *See Murtishaw I*, 29 Cal.3d at 768, 774, 175 Cal. Rptr. 738, 631 P.2d 446.

blood or urine sample from Murtishaw within 72 hours of the shootings. Murtishaw argues that, had Feringa obtained the samples during the 72–hour window, blood tests would have supported his claim that he was intoxicated by drugs and alcohol at the time of the shooting. We conclude that Feringa's failure to obtain the samples did not fall below an objective standard of reasonableness.

Murtishaw's father retained Feringa on April 11, 1978, the night before the arraignment. Feringa's first opportunity to meet with Murtishaw was the next day, April 12 (the day of the arraignment),[8] when Feringa met with him for 15 minutes before the arraignment and for two hours after the arraignment. The arraignment was at 2:00 in the afternoon. By the time the arraignment had concluded, the 72–hour window was near its end. Murtishaw claims to have used PCP on the night of April 8 and to have consumed alcohol throughout the day of April 9. The 72–hour window for the PCP had therefore ended the night before the arraignment on April 11. The 72–hour window for alcohol ended at about 5:30 p.m. on April 12 (Buflo testified that the shootings had occurred at about 5:30 p.m. on April 9). To obtain a blood sample from Murtishaw, Feringa would have had to obtain a court order to authorize a qualified person to take the sample, and to authorize Murtishaw's transport from jail to a laboratory center. The district court cited expert testimony that this process "took hours." The district court's determination that it was "logistically impossible" for Feringa to obtain blood or urine samples within the 72–hour window is supported by the evidence, and not clearly erroneous. *See Bonin,* 59 F.3d at 823 ("Findings of fact made by the district court relevant to the denial of

[Murtishaw's] habeas corpus petitions are reviewed for clear error."). Because Feringa was not required to do the impossible in order to be effective counsel, Murtishaw's claim that it was error for Feringa not to obtain the samples within 72 hours must fail.

*2. Delay in obtaining mental health experts.*

■ Next, Murtishaw claims that Feringa failed to provide effective assistance of counsel when he waited until May 5, 1978 to seek funds to retain a confidential mental health expert and when he waited until June 19, 1978 to have Murtishaw examined by his retained mental health experts, Dr. Rose and Dr. Maloney. We reject this claim as well.

Even if it is important to retain mental health experts as quickly as possible in death penalty cases, the delay in this case did not deprive Murtishaw of reasonably competent assistance. Feringa waited until the day of Murtishaw's arraignment in Superior Court to seek funds for a mental health expert. Perhaps Feringa could have sought funds earlier, but it was not unreasonable for him to wait until he was in court handling Murtishaw's arraignment to ask the court for the funds.

Nor did the delay from May 5, 1978 (when Feringa obtained the funds) to June 19, 1978 (when Dr. Rose and Dr. Maloney actually examined Murtishaw) amount to ineffective assistance of counsel. Feringa had urged Dr. Rose to examine Murtishaw earlier, but Dr. Rose was not able to perform the examination before that date. Given Dr. Rose's unavailability, it was not unreasonable for Feringa to wait until June 19 to have Murtishaw examined. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 ("[T]he performance inquiry must be

8. Feringa's office was in Los Angeles, over a hundred miles away from Bakersfield, where Murtishaw was in jail.

whether counsel's assistance was reasonable considering all of the circumstances."). Therefore, neither the delay in obtaining confidential funds nor the delay in conducting the actual examinations fell below an objective standard of reasonableness.

*3. Failure to notify the mental health experts of Murtishaw's family history of psychological problems and of his history of drug use.*

■ Murtishaw next contends that Feringa was ineffective when he failed to correct Dr. Rose's erroneous statement that there was no history of mental illness in Murtishaw's family. In fact, Feringa was aware at the time he hired Dr. Rose that Murtishaw's "mother had problems" and that his brother "had had a complete breakdown." Murtishaw also argues that Feringa was constitutionally deficient when he failed to notify Dr. Rose that Murtishaw used PCP. These claims also fail.

In *Hendricks v. Calderon,* 70 F.3d 1032, 1038 (9th Cir.1995), we noted that " '[i]n the absence of a specific request, an attorney is not responsible for gathering background material that might be helpful to a psychiatrist evaluating his client.' " (quoting *Bloom v. Vasquez,* 840 F.Supp. 1362, 1370 (C.D.Cal.1993)). To require an attorney to provide experts with all relevant information, we reasoned, "would raise the Sixth Amendment hurdle well above the floor of minimal competence" established by *Strickland. Id.* at 1039.

In this case, nothing suggests that either Dr. Rose or Dr. Maloney requested any background information from Feringa, or that Murtishaw failed to provide either doctor with any requested information. Absent such a specific request for information, Feringa was not required to provide either expert with additional information. *See id.* at 1038–39; *Coleman v. Calderon,* 150 F.3d 1105, 1115 (9th Cir.) *rev'd on other grounds;* 525 U.S. 141, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998); *Babbitt v. Calderon,* 151 F.3d 1170, 1174 (9th Cir.1998). Thus, under *Hendricks,* Feringa was not constitutionally incompetent for failing to inform the doctors of Murtishaw's family history of mental illness.[9]

*4. Failure to retain a new confidential mental health expert.*

■ Murtishaw next argues that both Feringa and Faulkner provided ineffective assistance of counsel when they failed to retain a new confidential expert after Dr. Rose had returned his report that Feringa thought was inaccurate. We disagree.

In deciding which course of action to take following the examinations by Dr. Rose and Dr. Maloney, both Feringa and Faulkner were entitled to take into account more than just the doctors' unfavorable reports; they could also factor into the equation the likelihood of additional funding and the availability of other methods of obtaining mental health experts. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

---

**9.** Our circuit's precedent that might suggest otherwise is distinguishable. In *Bean v. Calderon,* 163 F.3d 1073 (9th Cir.1998), we held that the defendant's counsel had been ineffective when he ignored the expert's requests for information. *See id.* at 1079. Again, neither Dr. Rose nor Dr. Maloney made such a request here. In *Caro v. Calderon,* 165 F.3d 1223 (9th Cir.1999), the panel found that counsel's failure to provide experts with relevant information was ineffective assistance of counsel only insofar as the penalty phase of the trial was concerned because counsel's failure prevented the jury from hearing "the most important evidence of mitigation"; it was not ineffective with regard to the guilt phase. *See id.* at 1226–27. In this case, Murtishaw does not argue that his experts during the penalty retrial were deprived of potentially relevant information.

In this case, both Feringa and Faulkner believed they would have a difficult time getting adequate funds for psychiatric review, consultation, and investigation. The record supports this belief. On May 5, 1978, the California trial court initially approved $1,000 for psychiatric experts and $750 for investigation experts. However, Feringa was required to appear again before the California court to obtain payment of this initial $1,750. Moreover, the court refused to pay Dr. Rose's bill for $500 without an explanation of why it was so high. The court also refused to approve the investigator's bill of $2401.95,[10] and it authorized a total payment of only $3,250 despite Feringa's request for $7,750.[11] Mr. Faulkner experienced similar difficulties. He spoke informally with the state judge who authorized such funds, but he did not receive the additional funds. Finally, although Faulkner had never attempted to obtain funds in a capital case before (this was Faulkner's first capital case), he had attempted to obtain funds in other murder cases, and in those cases he could obtain only $500.

Both Feringa and Faulkner also believed that the mental health information they could obtain from court-appointed experts would be helpful to Murtishaw's diminished capacity claim. Even after Feringa received the unfavorable reports from Drs. Rose and Maloney, he thought his best defense was "diminished capacity of some type" and that it either "was present or would become obvious" after court-appointed psychiatrists examined Murtishaw. Feringa's strategy did, in fact, pay off when he obtained favorable testimony from Dr. Kelly, who was a court-appointed psychiatrist. Faulkner also believed court-appointed psychiatrists

could be helpful, and he kept the NGI plea in place because he thought the additional medical examinations could help in the penalty phase and lead to something that would substantiate the NGI plea.

■ Given the evidence that the California court was frugal with regard to funding, and the possibility of obtaining information from court-appointed mental health experts, it was not unreasonable for either Feringa or Faulkner to pursue other avenues to obtain evidence of Murtishaw's mental health. Both Feringa and Faulkner could have done more to persuade the California court to authorize funds for another confidential expert. However, counsel's actions are not deficient just because, through "the fabled twenty-twenty vision of hindsight," a better course of action becomes apparent. *Campbell,* 18 F.3d at 673. Rather, "every effort" must be made "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Evaluating Feringa's and Faulkner's actions from their standpoint, we cannot say that it was objectively unreasonable for them to fail to obtain additional funds and experts. Murtishaw's claim therefore fails.

*5. Failure to have a confidential EEG performed*

■ Next, Murtishaw argues that Feringa was incompetent when he sought an EEG of Murtishaw by means of a noticed motion because the noticed motion alerted the prosecution to the defense strategy. Murtishaw also argues that Faulkner was constitutionally deficient when he failed to obtain a confidential EEG examination for Murtishaw. Again, both of these claims fail.

---

10. The district court erroneously reported the investigator's bill as $241.95. The correct amount is $2401.95.

11. Murtishaw does not attempt to fault the California court for this limitation of funds.

First, Murtishaw's contention that it was error for Feringa to seek an alcohol-induced EEG through noticed motion lacks support. The premise underlying this argument is that, absent the noticed motion, Murtishaw would have been able to conceal the diminished capacity defense from the prosecution until the trial. However, even if Murtishaw's lawyers could have received *ex parte* permission to subject Murtishaw to an alcohol-induced EEG, they could not have prevented the prosecution from obtaining and presenting evidence to rebut this defense. *See Buchanan v. Kentucky,* 483 U.S. 402, 422–23, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *People v. Danis,* 31 Cal.App.3d 782, 786–87, 107 Cal.Rptr. 675 (Cal.Ct.App.1973). Because the prosecution would have been able to obtain evidence to rebut the diminished capacity defense, the only effect of the noticed motion was to give the prosecution this opportunity sooner rather than later. Though the timing could have been better, any error was not "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Campbell,* 18 F.3d at 673 (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052) (internal quotes omitted). Accordingly, Feringa's noticed motion was not constitutionally incompetent.

■ Second, Faulkner was not ineffective for failing to obtain a confidential EEG for Murtishaw. Faulkner understood that the court had granted Feringa's motion for the EEG, but that the order required the EEG to be performed by a local expert. The only psychiatrist in Bakersfield at the time who could administer an EEG was Dr. Badgley. Faulkner chose not to have Dr. Badgley perform a confidential EEG because he was working in a partnership with Dr. Matychowiak and Dr. Burdick, the psychiatrists that the court had already appointed. Faulkner believed that Dr. Badgley's partnership with Drs. Matychowiak and Burdick could have created a conflict of interest, such that Dr. Badgley would no longer be Murtishaw's *confidential* expert. Given these facts, it was reasonable for Faulkner to forego having Dr. Badgley perform a confidential EEG.

■ Murtishaw also faults Faulkner for not having a local expert perform the EEG and then forwarding the results to an out-of-town expert for evaluation, and for not asking the court to modify its previous order requiring that the EEG be performed locally, given Dr. Badgley's potential conflict of interest. Although these may be legitimate criticisms of Faulkner's representation; we must consider all of the factors surrounding Faulkner's decision not to pursue more vigorously a confidential EEG in determining whether he was constitutionally ineffective. First, Faulkner had reports from his confidential experts, Dr. Rose and Dr. Maloney, that indicated Murtishaw had no brain disorders.[12] Faulkner was entitled to rely on these reports in deciding how far to pursue a defense based on brain damage. *See Morgan v. Bunnell,* 24 F.3d 49, 52 (9th Cir.1994). Second, Faulkner later consented to having Dr. Badgley perform an EEG,[13] and Faulkner was entitled to take

12. For example, Dr. Maloney found that Murtishaw had "a very good performance on the Bender Visual Motor Gestalt Test," which is "grossly sensitive to the effects of organic brain dysfunction."

13. Murtishaw also attacks Faulkner's consent to Badgley's EEG after Faulkner had decided against having Badgley do a confidential EEG. The decision was not unreasonable. Faulkner's concern about Badgley's conflict of interest relates not to whether Badgley's results would be favorable, but rather to whether they would be confidential. Faulkner could have reasonably doubted the confidentiality of an EEG by Badgley (because of Badgley's partnership with Drs. Matychowiak

the results of that EEG into account when deciding whether to pursue a confidential EEG. After the EEG, Faulkner telephoned Badgley, who told him that Murtishaw exhibited some brain damage, but that the EEG was within the normal limits. Based on this information from Drs. Rose, Maloney, and Badgley, Faulkner could have reasonably concluded that further investigation of Murtishaw's possible brain damage was unwarranted. *See Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). Therefore, Faulkner's failure to obtain a confidential EEG was not unreasonably deficient.

### 6. Failure to obtain a confidential PCP expert.

Finally, Murtishaw argues that Faulkner was constitutionally ineffective when he failed to obtain blood samples that might have shown that Murtishaw was a PCP user, and when he failed to obtain a PCP expert. These claims also fail.

■ Faulkner was not deficient for not obtaining blood or urine samples from Murtishaw. At the evidentiary hearing, Murtishaw's *Strickland* expert and the State's *Strickland* expert disagreed over whether a reasonably competent attorney would have known that tests were available in 1978 to detect PCP in a person's system months after it was ingested. However, we need not resolve this dispute to reject Murtishaw's claim, because even

if the failure to obtain the blood samples and the PCP tests was unwise, it was not serious enough to rise to the level of ineffective assistance. All that the PCP tests would have shown is that Murtishaw had ingested PCP sometime in the months preceding the test. The tests would not have pinned down the dates on which Murtishaw used PCP, nor would they have shown that Murtishaw was intoxicated by PCP at the time of the shootings. Moreover, had the prosecution seriously challenged Murtishaw's claim that he used PCP in the past, Murtishaw could have presented witnesses to testify that they had seen Murtishaw use PCP. The tests were therefore of limited value, and Faulkner's failure to obtain them was not so substantial as to deny Murtishaw of the counsel guaranteed by the Sixth Amendment. Therefore, Faulkner's representation did not fall below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

■ Nor was Faulkner constitutionally deficient for failing to obtain a confidential PCP expert. As discussed earlier, Faulkner was under the reasonable impression that the court was unwilling to provide additional funding for confidential experts. Moreover, Faulkner was presented with an opportunity to have Dr. Siegel examine Murtishaw. Before consenting to Dr. Siegel's examination, Faulkner spoke with Dr. Siegel and confirmed that Siegal had testified favorably for Faulkner's former law partner and several Los Angeles public defenders. Local defense attorneys and

and Burdick), and based on that doubt, he could have reasonably decided not to spend his scarce court-granted funds for confidential experts on a Badgley EEG. Because he reasonably doubted the confidentiality of a Badgley EEG, however, does not mean he unreasonably trusted the reliability of that EEG. Although Badgley was a prosecution-retained expert, Faulkner had worked with

him in the past. Moreover, Faulkner believed that an EEG by Badgley could produce results that would "help ... during the penalty phase." Given these facts, it was not unreasonable for Faulkner to advise Murtishaw to consent to Badgley's administration of the EEG, and the decision is therefore entitled to deference.

public defenders thought that Siegel was reliable and a "straight shooter," and Faulkner believed he could obtain positive evidence from Dr. Siegel. Based on this investigation, and on his belief that his confidential funds were limited, Faulkner made a reasonable decision to have Dr. Siegel serve as a PCP expert. That decision, "made after thorough investigation of law and facts relevant to plausible options[, is] virtually unchallengeable ..." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Faulkner was thus not incompetent for failing to obtain a confidential PCP expert.

### C. Failure to Research and Request an Instruction on an Imperfect Self Defense Theory.

■ Murtishaw concedes that there was no basis in the record to support a defense of justifiable homicide based on self defense. However, Murtishaw claims that Faulkner provided ineffective assistance when he failed to discover and request a jury instruction on the theory of imperfect self defense—that Murtishaw held an honest but unreasonable belief that his use of deadly force was necessary to protect himself. We disagree.

The California Supreme Court in *Murtishaw I,* 29 Cal.3d 733, 762 n. 23, 175 Cal.Rptr. 738, 631 P.2d 446 (Cal.1981) explicitly rejected the claim that Murtishaw now raises. The court began its analysis with *People v. Flannel,* 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1 (Cal.1979), which addressed whether a trial court was required sua sponte to give juries an imperfect self-defense instruction when the facts of the case warranted such an instruction.

The court held that trial courts before the *Flannel* case were not required to give the instruction sua sponte, but that after *Flannel* trial courts were required to give the instruction. *See id.* at 682–83, 160 Cal. Rptr. 84, 603 P.2d 1. In reaching this decision, the court noted that the imperfect self defense theory had been discussed in several cases. *See id.* at 682, 160 Cal. Rptr. 84, 603 P.2d 1 (citing *People v. Sedeno,* 10 Cal.3d 703, 112 Cal.Rptr. 1, 518 P.2d 913 (Cal.1974) *overruled on other grounds* by *People v. Breverman,* 19 Cal.4th 142, 77 Cal.Rptr.2d 870, 960 P.2d 1094 (1998); *People v. Lewis,* 186 Cal.App.2d 585, 9 Cal.Rptr. 263 (Cal.Ct.App.1960); *People v. Best,* 13 Cal.App.2d 606, 57 P.2d 168 (Cal. Ct.App.1936); *People v. Wells,* 33 Cal.2d 330, 202 P.2d 53 (Cal.1949)). However, according to the court, the defense was "obfuscated by infrequent reference and inadequate elucidation," *id.* at 681, 603 P.2d 1, had "remained indistinct," had "failed to achieve headnote status," and had not received a "standard CALJIC instruction," *id.* at 682, 603 P.2d 1. According to the California Supreme Court, it was "implicit in [its] discussion of the doctrine of [imperfect] self-defense in *Flannel* that the doctrine was one which, owing to its uncertain and undeveloped character, might well be overlooked by a reasonably competent practitioner." *Id.* at 762 n. 23.

Murtishaw claims that a reasonably competent attorney would have been alerted to the theory by the headnotes in *People v. Wells,* 33 Cal.2d 330, 345, 202 P.2d 53 (Cal.1949), the clearest discussion of the imperfect self-defense theory by California courts prior to *Flannel.*[14] We cannot

14. The *Wells* court articulated the theory as follows:
 If [defendant] acted only under the influence of fear of bodily harm, in the belief, honest though unreasonable, that he was defending himself from such harm by the use of a necessary amount of force, then defendant, although he would not be guilt-

less of crime, would not have committed that particular aggravated offense with which he is charged, for the essential element of "malice aforethought" would be lacking.
 *People v. Wells,* 33 Cal.2d 330, 345, 202 P.2d 53 (Cal.1949).

agree. The headnotes Murtishaw cites, numbers 10a and 10b, are entitled "Assault § 45—By Life Convict—Evidence," and they present the theory within a fact-intensive discussion of evidentiary error. *See Wells*, 33 Cal.2d at 331, 202 P.2d 53. The theory was completely absent from the headnotes in the Pacific Reporter version of the same case. *See People v. Wells*, 33 Cal.2d 330, 202 P.2d 53 (1949) (headnote 14). Given the obscurity of this reference, we conclude that it is not sufficient to satisfy Murtishaw's burden of proving that a reasonably competent attorney would have discovered the imperfect self defense theory from the *Wells* headnotes.

Murtishaw further argues that a reasonably competent attorney would have discovered the theory in the 1972 West Digest under an entry for *People v. Best*, 13 Cal.App.2d 606, 57 P.2d 168 (Cal.Ct.App. 1936). However, the entry in the West's Digest is not clearly on point, and in fact, a reasonably competent attorney may not have even read the West's Digest passage. The entry is entitled: "V. Excusable or Justifiable Homicide; 116 Apprehension of Danger; 116(4)k. Necessity that apprehension be reasonable." This title relates to a traditional self-defense theory, and it actually suggests that a defendant's belief in the need for self defense must be reasonable. By Murtishaw's own admission, however, traditional self-defense was not a viable theory for his case. It is not clear why Murtishaw believes a reasonably competent attorney performing research would have bothered to read the entry at all. We therefore conclude that Faulkner's failure to develop the unreasonable self defense theory from the entry in West's Digest was not constitutionally incompetent.

Murtishaw's reliance on these two entries, and a few other secondary sources, does not overcome the strong presumption in *Strickland* that counsel "rendered adequate assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. The California Supreme Court found that the imperfect self defense theory was "obscur[e]," "obfuscated," and "indistinct" at the time of Murtishaw's trial. *See Flannel*, 25 Cal.3d at 681–82, 160 Cal.Rptr. 84, 603 P.2d 1. The district court, after its own search using the tools available to Faulkner, found that its research "revealed no such legal authority" for the imperfect self-defense theory. The sources to which Murtishaw points simply do not suggest otherwise, and they do not establish that the theory would have been discovered by a reasonably competent attorney. Faulkner therefore was not constitutionally deficient for failing to develop and present the theory. *Cf. Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir.1994) (holding that a lawyer is not ineffective for failing to anticipate a decision in a later case).

## D. Entry and Maintenance of the NGI plea.

■ Murtishaw claims that Feringa was incompetent for entering the not guilty by reason of insanity (NGI) plea, and that Faulkner was incompetent for allowing the plea to stand after he took over the case. We reject each of these claims.

Feringa entered the NGI plea for several reasons. First, despite the findings by Murtishaw's confidential experts, Dr. Rose and Dr. Maloney, that Murtishaw was sane at the time of the shooting, Feringa believed that an NGI plea still had merit. Second, he was dissatisfied with the reports he had obtained from Dr. Rose and Dr. Maloney, and wanted Murtishaw reexamined. Third, Feringa mistakenly believed that the reports from the court-appointed experts would be confidential. And fourth, Feringa believed that the information he would obtain from the court-appointed experts would eventually sub-

stantiate the NGI plea or the diminished capacity defense.

Murtishaw first attacks Feringa's initially mistaken belief that the court-appointed experts would provide confidential information. Before Murtishaw was examined by a court-appointed expert, however, the court corrected Feringa of his mistake and informed him that the reports would not be confidential. Knowing that the reports would be available to the prosecution, Feringa made the decision to keep the NGI plea in place. His initially mistaken belief about the confidentiality of the reports thus had absolutely no effect on his representation of Murtishaw, and therefore the mistake, even if it was professionally unreasonable, is not grounds for setting aside Murtishaw's conviction. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

█ Murtishaw next attacks Feringa's other tactical reasons for entering the plea. Specifically, he claims that Feringa should not have entered the plea without confidential reports to substantiate it, and that Feringa should have sought additional mental health evidence from confidential experts, rather than from court-appointed experts. These alleged errors, however, will not substantiate Murtishaw's ineffective assistance claim if the attorneys' actions were the result of sound trial strategy. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. The claims will fail if "1) counsel in fact base[d] trial conduct on strategic considerations; 2) counsel ma[de] an informed decision based upon investigation; and 3) the decision appears reasonable under the circumstances." *Thompson v. Calderon,* 109 F.3d 1358, 1365 (9th Cir.

1996), *rev'd on other grounds,* 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998).

Before Feringa entered the NGI plea, he investigated the theory by repeatedly questioning Murtishaw about the incident, speaking with Murtishaw's family members about any possible reasons for the shootings, learning of Murtishaw's family history of mental illness, and learning of Murtishaw's history of drug use. After performing this investigation, Feringa did in fact enter the NGI plea based on a strategy to develop the defense "with every type of psychiatric assistance that [he] could get." The necessities of the situation made this strategy reasonable, at least from the perspective of an attorney who does not have the benefit of hindsight. Feringa had already received unfavorable reports from two psychiatric experts, with which he was dissatisfied. Also, as discussed earlier, he reasonably believed that he would have trouble obtaining additional court-ordered funds to hire another confidential expert. And perhaps most importantly, Feringa was faced with a situation that he could not explain and that "seemed to be a totally insane act" by all outward appearances. Given these exigencies, it was reasonable for Feringa to conclude that the only plausible strategy was to attempt to develop both an insanity defense and a diminished capacity defense using the resources that would accompany an NGI plea.[15] We therefore defer to Feringa's trial strategy, which seemed reasonable at the time. *See Campbell,* 18 F.3d at 673.

█ Murtishaw similarly attacks Faulkner's decision to maintain the NGI plea after he took over the case from Feringa. When Faulkner substituted into the case and read the reports from Drs.

15. It is worth noting that Feringa's strategy was at least partially successful. Dr. Kelly was a psychiatrist that the court appointed after the entry of the NGI plea, and he provided favorable opinions for Murtishaw at the guilt trial.

Rose, Maloney, Matychowiak, Burdick, and Kelly, he thought that the insanity defense was not available. Despite this skepticism about the NGI plea, Faulkner nevertheless kept it in place. Faulkner asserted two reasons for doing this: to keep the prosecution "off balance" and to maintain the possibility that evidence would arise to substantiate the NGI plea. He also thought he could use the plea to obtain additional mental health examinations to help substantiate the diminished capacity defense, which he viewed as a weak, but possible, defense.

Faulkner also requested that Murtishaw be reexamined to determine his sanity according to the new insanity standard established by *People v. Drew*, 22 Cal.3d 333, 149 Cal.Rptr. 275, 583 P.2d 1318 (Cal. 1978).[16] Faulkner did not believe that an insanity defense would be possible even under the new *Drew* rule. Faulkner did, however, believe that the additional mental health evaluations would be beneficial in the penalty phase of the trial, and that the reexaminations would be a favorable way of obtaining mental health evidence despite the reasonably perceived unavailability of additional confidential funds.

Faulkner's decision to maintain the NGI plea and to have Murtishaw reexamined did not fall below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. Faulkner had multiple justifications for these actions. These justifications for Faulkner's strategy are reasonable, and therefore entitled to deference by this Court. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Accordingly, we reject Murtishaw's claim of ineffective assistance for the entry and maintenance of the NGI plea.

### E. Failure to Inform Murtishaw of Waiver of his Fifth Amendment Rights

Murtishaw claims that both Feringa and Faulkner were incompetent when they did not fully inform Murtishaw that by entering the NGI plea he was waiving his Fifth Amendment right against self-incrimination. We reject this claim.

 Criminal defendants have a Sixth Amendment right to consult with counsel before they submit to court-ordered psychiatric interviews, so that they can make informed decisions about whether to waive their Fifth Amendment right against self-incrimination. *See Estelle v. Smith*, 451 U.S. 454, 470–71, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Murtishaw claims that neither Feringa nor Faulkner informed him that by submitting to the court-ordered examinations he was waiving his right against self-incrimination. The evidence does not indicate, one way or the other, whether Feringa or Faulkner actually notified Murtishaw of this waiver before they advised him to participate in the examinations.[17] Where there are no supportable allegations to the contrary, and where the defense counsel requested the examinations (as Feringa did here, when he entered the NGI plea), we can assume that counsel did consult with the defendant about the nature of the examination. *See Buchanan v. Kentucky*, 483 U.S. 402, 424, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). Thus, the question becomes whether the advice to consent to the examinations was reasonably competent.

The decision to have Murtishaw submit to the examinations by court-appointed ex-

---

16. These requests were granted, and Murtishaw was reexamined by Drs. Matychowiak, Burdick, and Kelly.

17. Feringa testified at the evidentiary hearing that he did not recall whether he had notified Murtishaw of this fact; there is no evidence with regard to whether Faulkner notified Murtishaw.

perts was reasonable. As discussed earlier, Drs. Rose and Maloney had returned unfavorable confidential reports. Both Feringa and Faulkner believed they could obtain useful evidence from the court-appointed experts. Both Feringa and Faulkner believed that they would have trouble obtaining court-authorized funds for additional confidential mental health examinations. And, both Feringa and Faulkner had reasonable strategic justifications for entering and maintaining the NGI plea (to substantiate it, and to keep the prosecution off-balance). Given these facts, it was reasonable for both Feringa and Faulkner to advise Murtishaw to participate in the examinations by the court-appointed experts. Therefore, we reject Murtishaw's claim that Feringa and Faulkner acted in a constitutionally incompetent manner for advising him to consent to the court-ordered examinations.

### F. Consent to Badgley & Siegel Examinations

Murtishaw claims that it was ineffective assistance of counsel for Faulkner to consent to examinations by Dr. Badgley and Dr. Siegel. We have already discussed these claims, albeit in other contexts. *See supra* note 13 (discussing Faulkner's consent to the Badgley examination); *supra* Part I.B.6 (discussing Faulkner's failure to obtain a confidential PCP expert). As those discussions indicate, Faulkner's consent to each of the examinations was reasonable. We therefore reject Murtishaw's claims of ineffective assistance for Faulkner's consent to the examinations.

### G. Failure to Investigate Laufenburger, and Murtishaw's Family History

▮ Murtishaw claims that Feringa and Faulkner were deficient in failing to investigate more fully Laufenburger, and Murtishaw's family and social history. We need not determine whether these alleged

failures fell below an objective standard of reasonableness, because these claims do not survive *Strickland*'s prejudice prong. *See Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.

Even if Faulkner and Feringa had interviewed Murtishaw's family and gained information that they could use to impeach Laufenburger (as Murtishaw now suggests they should have done), it would have had no effect on the outcome of the trial. Substantial evidence other than Laufenburger's testimony supported a finding of premeditation and deliberation. Murtishaw reloaded his rifle at least twice, and fired upon (and hit) the students from as far away as seventy feet. Moreover, the district court found that the alleged inconsistencies in Laufenburger's testimony would not have been so grave as to exclude the testimony altogether; rather, it would have gone only to Laufenburger's credibility. The jury might have discounted Laufenburger's testimony somewhat had it been aware of the inconsistencies, but given that the testimony agreed in many respects both with Buflo's testimony and with Murtishaw's taped statement, this possibility does not "undermine the confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Therefore, we find that the alleged failure to investigate, even if constitutionally deficient, did not prejudice Murtishaw's trial.

### II. FELONY MURDER INSTRUCTION

▮ Murtishaw claims that it was error for the California trial court to give the jury a felony murder instruction based on Murtishaw's intent to steal the victims' car, because Murtishaw was unaware that the prosecution was proceeding on such a theory and therefore was unable to prepare a defense to that charge. To support this claim, Murtishaw correctly points out that a felony murder theory was not raised in the charging document or at the prelim-

inary hearing. Nor did the prosecution question any of its expert witnesses about whether Murtishaw could form the intent to steal the car. Instead, the expert witnesses testified only as to whether Murtishaw could have premeditated and deliberated in commission of the murders. However, we conclude that Murtishaw was nevertheless given sufficient notice of the felony murder theory, and that the instruction was therefore proper.

We are guided by *Morrison v. Estelle,* 981 F.2d 425 (9th Cir.1992). The *Morrison* court held that "constitutionally adequate notice of a felony-murder charge could be provided to a defendant by means other than the charging document." *Id.* at 427. In *Morrison,* the prosecutor presented evidence of the defendant's intent to commit robbery and requested the felony murder instruction at the initial instructions conference (two days before closing arguments). *See id.* at 428–29. We held that these factors gave the defendant sufficient notice of the prosecution's felony-murder theory to allow the felony-murder instruction to stand. *See id.*

Based on a comparison of the facts of *Morrison* and the present case, we conclude that the notice of the felony-murder theory afforded Murtishaw was even greater than that provided to the defendant in *Morrison.* First, in contrast to *Morrison,* the prosecutor in this case stated in his opening statement that he would elicit testimony from Laufenburger that

Murtishaw's motive for killing the students was to steal their car. Second, the evidence to support a felony murder theory in this case was much stronger than that in *Morrison.* Here, Laufenburger testified that Murtishaw suggested stealing the car; no such direct evidence of intent to steal was presented in *Morrison.* The indirect evidence of intent to steal is also greater in this case than in *Morrison.* Because the evidence to support a felony murder theory is greater in this case, the notice of the theory provided by that evidence is also greater in this case than in *Morrison.* Finally, Faulkner's actions at trial suggest that he actually had notice of the felony murder theory during the trial. Faulkner directed part of his cross-examination of Laufenburger at Murtishaw's intent to steal the car,[18] and he did not request a continuance when the prosecutor requested a felony murder instruction at the initial instructions conference. No comparable evidence of actual notice was present in *Morrison.* Therefore, based on our comparison of this case and *Morrison,* we hold that Murtishaw had constitutionally adequate notice of the felony murder theory, and that the trial court did not err in giving the jury the felony murder instruction.[19]

### III. FAILURE TO GIVE SUA SPONTE AN INSTRUCTION ON IMPERFECT SELF DEFENSE

■ Murtishaw claims that the trial court was required, but failed, to provide

---

18. For example, during Laufenburger's cross-examination Faulkner asked the following questions to discredit Laufenburger's testimony about stealing the car: "Q: Now when you said that David said something about stealing a car, stealing their car, where were you at then. A: I was with him." "Q: And David was—and they were gone and David was talking about shooting these guys, during that time? A: Yes. Q: And taking the car? A: Yes. Q: Their car wasn't there, was it? A: No."

19. Murtishaw's reliance on *Sheppard v. Rees,* 909 F.2d 1234 (9th Cir.1989), is misplaced. In *Sheppard,* the state had conceded that the defendant was denied adequate notice of the felony murder theory, and therefore the only question decided by *Sheppard* was whether a harmless error analysis was appropriate in such a situation. *See Morrison,* 981 F.2d at 428; *Sheppard,* 909 F.2d at 1236–37. Accordingly, the statements in *Sheppard* about the adequacy of the notice are dicta.

sua sponte an instruction on the theory of imperfect self defense.[20] Murtishaw bases this argument on *People v. Flannel*, 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1 (Cal.1979), in which the California Supreme Court held that trial courts before *Flannel* were not required to give an imperfect self defense instruction sua sponte, but that after *Flannel* trial courts were required to give the instruction sua sponte, if the evidence warranted it. *See id.* at 682–83, 160 Cal.Rptr. 84, 603 P.2d 1. Murtishaw argues that the *Flannel* rule should have been applied to his case, even though his trial occurred before the California Supreme Court decided *Flannel*. To justify this claim, Murtishaw relies first on the rule of *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), that trial courts must provide jury instructions on lesser included offenses. In the alternative, Murtishaw relies on *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), which requires courts to apply new rules of criminal procedure to all cases pending on direct review. We reject both arguments.

In *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Supreme Court reversed a conviction and death sentence where a state statute prevented the trial court from giving an instruction on lesser included offenses. *See id.* at 633–38, 100 S.Ct. 2382. The Court reasoned that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* at 637, 100 S.Ct. 2382. Thus, the Court held that it violated due process

for the jury instructions to present the jury with only two options: guilty of capital murder, or acquittal.

■ In this case, the jury was given instructions on the lesser included offenses of second degree murder and manslaughter, and it was told that it must find for one of these offenses if the evidence warranted such a verdict. *See Murtishaw I*, 29 Cal.3d at 762, 175 Cal.Rptr. 738, 631 P.2d 446. These instructions satisfied the requirements of *Beck*. Contrary to Murtishaw's argument, *Beck* does not require trial courts to provide sua sponte instructions on each theory that could justify a lesser included offense. Rather, it merely requires courts to provide instructions on the lesser included offenses, thus preventing the State from forcing juries to make an "all or nothing" choice between acquittal and capital murder. *See Beck*, 447 U.S. at 638, 100 S.Ct. 2382 ("[I]f the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [the State] is constitutionally prohibited from withdrawing that option from the jury in a capital case."). Murtishaw's jury was not presented with an "all or nothing" situation, as was the jury in *Beck*. It was instead expressly presented with a range of options, which eliminated the "enhance[d] ... risk of an unwarranted conviction" that was present in *Beck*. *Id.* at 637, 100 S.Ct. 2382. The trial court's failure to give sua sponte an imperfect self defense instruction therefore did not violate *Beck*.

■ Murtishaw next argues that *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), requires retroactive application of the rule announced in *Flannel*. *Griffith* held that "a new rule for the conduct of criminal prosecutions is

**20.** This argument is separate and distinct from Murtishaw's claim that counsel was in-

effective for failing to research and request an imperfect self defense theory.

to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id.* at 328, 107 S.Ct. 708. Thus, the question whether *Griffith* requires the *Flannel* rule to apply retroactively presents two issues: first, was Murtishaw's case "final" at the time *Griffith* was announced; and second, was the *Flannel* rule a "newly declared constitutional rule" that is covered by *Griffith*, or merely a rule of state common law.

The first issue presented by *Griffith*, whether Murtishaw's conviction was "final" when the Supreme Court decided *Griffith*, is a difficult question. Murtishaw's guilt conviction was affirmed by the California Supreme Court in 1981, *see Murtishaw I*, 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446 (Cal.1981), and the Supreme Court denied certiorari on the guilt conviction in 1982, *see Murtishaw v. California*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1982). However, Murtishaw's direct appeals of his death sentence were not exhausted until 1990, when the Supreme Court denied certiorari on Murtishaw's appeal from his second death sentence. *See People v. Murtishaw*, 48 Cal.3d 1001, 258 Cal.Rptr. 821, 773 P.2d 172 (Cal.1989), *cert. denied, Murtishaw v. California*, 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 764 (1990). The question whether *Griffith* applies thus depends on whether Murtishaw's case was "final" in 1982, when the Supreme Court denied certiorari on the guilt conviction, or in 1990, when the Supreme Court denied certiorari on the penalty. We decline to answer this question, because Murtishaw's claim may be more easily disposed of by the second prong of *Griffith*.[21]

■ *Griffith* requires retroactive application only of "new constitutional rules of criminal procedure," *Griffith*, 479 U.S. at 322, 107 S.Ct. 708. It does not require retroactive application of every new state-declared common law rule. Murtishaw argues that *Flannel* was implicitly based on constitutional principles because it contained overtones of due process. The *Flannel* court, however, did not cite to the federal or state Constitution in reaching its decision that trial courts must give sua sponte instructions of the unreasonable self-defense theory. *See Flannel*, 25 Cal.3d at 681–83, 160 Cal.Rptr. 84, 603 P.2d 1. Furthermore, in *Murtishaw II*, the California Supreme Court expressly held that the *Flannel* rule was based on state common law, not on the Federal Constitution. *See Murtishaw II*, 48 Cal.3d at 1014, 258 Cal.Rptr. 821, 773 P.2d 172. Murtishaw cannot cite to any authority indicating that the federal constitution requires a sua sponte instruction on the imperfect self-defense theory. We therefore must defer to the California Supreme Court's interpretation of the *Flannel* rule as a state common law requirement, rather than a federal constitutional requirement. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). Accordingly, *Griffith* does not require retroactive application of the *Flannel* rule to Murtishaw's case. *See Griffith*, 479 U.S. at 322, 107 S.Ct. 708.

## IV. TRIAL COURT'S ACCEPTANCE OF THE NGI PLEA

Murtishaw argues that the trial court committed a structural error when it ac-

---

**21.** We do note, however, that at least one of our sister circuits has held that a defendant's case becomes "final" for purposes of *Griffith* when he exhausts his direct appeals of his conviction, even if the direct appeals of his sentence have not yet been exhausted. *See Holman v. Gilmore*, 126 F.3d 876 (7th Cir. 1997).

cepted Murtishaw's not guilty by reason of insanity (NGI) plea. When the trial court accepted the NGI plea it asked the prosecutor to perform a formal arraignment, at which Murtishaw would have been informed of his rights. Feringa waived this arraignment and formal reading. The trial court then appointed two experts, Dr. Matychowiak and Dr. Burdick, whom Feringa mistakenly believed would be confidential. The court corrected Feringa of this mistake, and informed him that the experts would return their reports to the court. The court also told Feringa that he would have to hire additional confidential experts with the confidential funds authorized by a different judge (Judge Noriega). Feringa expressly acknowledged this fact, and kept the NGI plea in place.

■ Murtishaw asserts that it was error for the trial court to allow the NGI plea to stand without independently informing Murtishaw that doing so would waive his Fifth Amendment rights. According to Murtishaw, because Feringa entered the NGI plea based on his initial belief that the court-appointed experts would be confidential, the trial court had a duty to inform Murtishaw directly that he was waiving his Fifth Amendment right against self-incrimination by entering the NGI plea. However, neither of the cases Murtishaw relies upon, *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), leads to this result. We therefore hold that the trial court did not err by accepting Murtishaw's NGI plea.

In *Estelle*, the Supreme Court held that a defendant has a Fifth Amendment right to be informed that he need not consent to a court-ordered psychiatric examination in which the results could be used against him at trial. *See id.* at 466–69, 101 S.Ct. 1866. The *Estelle* Court also held that a defendant is entitled to the assistance of

counsel in deciding whether to submit to a psychiatric examination in which the results of the examination could be used against him. *See id.* at 471, 101 S.Ct. 1866.

Murtishaw's primary argument with regard to *Estelle* is that Feringa and Faulkner were ineffective in advising him to waive his Fifth Amendment rights. *See supra* Part I.E. He also argues that because Feringa was mistaken about the confidentiality of the psychiatric reports, his consent to the NGI plea was invalid. Therefore, Murtishaw argues, his Fifth Amendment rights were violated when the trial court accepted the plea and ordered the psychiatric examinations without first obtaining a knowing and voluntary waiver of Murtishaw's Fifth Amendment rights.

■ We have already held that Murtishaw was not denied effective assistance of counsel when Feringa entered the NGI plea and advised Murtishaw to consent to the court-ordered examinations. *See supra* Part I.E. This compliance with the Sixth Amendment also satisfies the Fifth Amendment requirements of *Estelle*. If a defendant decides to waive his right against self-incrimination based upon the advice of counsel, then that decision is knowing and voluntary for purposes of the Fifth Amendment, as long as counsel's advice was constitutionally reasonable under the Sixth Amendment and *Strickland*. *See Hill v. Lockhart*, 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (holding that a guilty plea, and consequently a complete statement of self-incrimination, is voluntary and intelligent as long as counsel's advice·to enter the plea was "within the range of competence demanded of attorneys in criminal cases"). Because Feringa acted within the bounds of reasonably effective counsel when he advised Murtishaw to consent to the examinations, Murtishaw's decision to waive his Fifth

Amendment rights was both knowing and voluntary. Consequently, the trial court did not err in allowing the court-appointed psychiatrists to examine Murtishaw and to testify at trial about their findings.

 Murtishaw next cites *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), for the proposition that when defendants enter an NGI plea, courts must inquire of them whether they understand that doing so will constitute a waiver of their Fifth Amendment rights. This reading of *Boykin* is much too broad. *Boykin* holds that when a defendant enters a guilty plea, the record must affirmatively show that the plea was intelligent and voluntary. *See Boykin,* 395 U.S. at 242, 89 S.Ct. 1709. This requirement does not apply when a defendant enters a plea that is not itself a conviction. *See Adams v. Peterson,* 968 F.2d 835, 842 (9th Cir. 1992) (en banc) (holding that *Boykin* warnings are not necessary when a defendant enters a not guilty plea in combination with stipulated facts, even if the stipulation is to all the elements necessary for a conviction, because such a plea "is simply not equivalent to a guilty plea"). In California, entering an NGI plea in combination with a not guilty plea does not admit the commission of the offense, and therefore it is not itself a conviction. *See* Cal.Penal Code § 1016; *People v. Wagoner,* 89 Cal. App.3d 605, 610–11, 152 Cal.Rptr. 639 (Cal. Ct.App.1979). In this case, Murtishaw maintained a not guilty plea along with his NGI plea. Because Murtishaw's plea was not "itself a conviction," *Boykin,* 395 U.S. at 242, 89 S.Ct. 1709, he was not entitled to *Boykin* warnings. *See Duffy v. Foltz,* 804 F.2d 50, 52 (6th Cir.1986) (holding that a defendant was not entitled to *Boykin* warnings when he entered an NGI plea because, under Michigan law, an NGI plea did not itself incriminate the defendant).

We reject Murtishaw's claim that the trial court erred by not informing him that entry of the NGI plea waived his Fifth Amendment rights.

## V. LAUFENBURGER'S TESTIMONY AND PROSECUTORIAL MISCONDUCT

Murtishaw argues that Laufenburger gave perjured testimony at the guilt trial, and that the prosecution knowingly presented, and perhaps even encouraged, this perjured testimony. Murtishaw argues that the prosecution's acts therefore violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We disagree.

Murtishaw alleges two instances of perjury: 1) Laufenburger's testimony that he did not want to steal the students' car; and 2) Laufenburger's testimony that he did not fire his gun just before or at the time Murtishaw began shooting at the victims. Murtishaw alleges also that the prosecution encouraged Laufenburger to testify that he did not agree to steal the car. The evidence Murtishaw presents in support of this theory is an affidavit signed in 1990 by Steven Murtishaw, the defendant's brother, in which Steven declares that Laufenburger's wife told Steven that she heard the prosecutor tell Laufenburger not to say that he had agreed to steal the car.

 This alleged perjury and prosecutorial misconduct does not warrant a grant of the habeas petition. Murtishaw's evidence of the perjury and prosecutorial misconduct comes in the form of an affidavit from Murtishaw's brother, taken more than 10 years after the trial, and based largely on hearsay. This evidence is not sufficient to grant the petition. *See Herrera v. Collins,* 506 U.S. 390, 417–18, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (holding on the facts of the case that affidavits containing hearsay statements and obtained eight years after the habeas peti-

tioner's trial was not sufficient to grant the petition).

Even if we found the affidavit credible, the allegations of perjury do not warrant relief. With respect to Murtishaw's allegation that Laufenburger perjured himself by denying an agreement to steal the students' car, although Laufenburger did not testify that he agreed to steal the car, he did not testify that he rejected the idea either. Because the facts simply do not support Murtishaw's first allegation of perjury and prosecutorial misconduct, we must reject that claim.

With respect to Murtishaw's second allegation that Laufenburger lied about when he fired his gun, Laufenburger testified that he fired his gun after Murtishaw had stopped shooting. This testimony conflicts with Steven Murtishaw's assertion that Laufenburger told Steven that he started shooting his gun into the ground when Murtishaw started shooting. This inconsistency does not warrant a grant of the habeas petition.

 If the prosecution knowingly presented false testimony, Murtishaw is entitled to relief only "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Alternatively, Murtishaw is entitled to relief if the prosecution suppressed evidence that Laufenburger's testimony was false, and that evidence "is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

 Assuming for the sake of argument that Laufenburger's testimony about when he fired his gun was false, Murtishaw presents no evidence that the prosecution knew it was false. Steven Murtishaw's affidavit claims prosecutorial misconduct with regard to the agreement

to steal the car, but not with regard to the timing of Laufenburger's discharge of his gun. Furthermore, even assuming that the prosecution knew that Laufenburger's testimony was false, and assuming that the prosecutor suppressed evidence of this falsehood, Murtishaw's claim fails. Steven Murtishaw's affidavit suggests that Laufenburger shot his gun *when* Murtishaw started shooting, not before. This account of the facts does not substantiate Murtishaw's claim that he heard two shots *before* he started shooting, and that his shooting was in reaction to those shots. The affidavit thus is not "material either to guilt or punishment," *Brady*, 373 U.S at 87, 83 S.Ct. 1194; nor does it establish a "reasonable likelihood that the false testimony could have affected the judgment of the jury," *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392. Murtishaw's claims of perjury and prosecutorial misconduct therefore must fail.

## VI. CONSTITUTIONALITY OF CALIFORNIA'S DEATH PENALTY STATUTE

Murtishaw claims that, even if his conviction is valid, his petition for a writ of habeas corpus should nevertheless be granted because he was sentenced to death under a facially unconstitutional death penalty statute. We disagree.

In 1972, the California Supreme Court held that the California death penalty violated the cruel or unusual punishment clause of the California Constitution. *See People v. Anderson*, 6 Cal.3d 628, 100 Cal. Rptr. 152, 493 P.2d 880 (1972). Later that year, California voters approved Proposition 17 by an initiative vote, and thereby amended the California Constitution specifically authorizing the death penalty. Proposition 17 is now in the California Constitution as article I, section 27:

960

All statutes of this state in effect on February 17, 1972 requiring, authorizing, imposing, or relating to the death penalty are in full force and effect, subject to legislative amendment or repeal by statute, initiative, or referendum.

The death penalty provided for under those statutes shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishment within the meaning of Article I, § 6, nor shall such punishment for such offense be deemed to contravene any other provision of this constitution.

Cal. Const. art. I, § 27.

Murtishaw argues that this state constitutional amendment violates the U.S. Constitution for four reasons: 1) it purports to eliminate the substantive constitutional "right to life" (no death penalty as punishment) legally established by *Anderson;* 2) it violates the separation of powers of California's governmental branches, and therefore violates the Due Process clause of the U.S. Constitution; 3) it used the anti-republican process of popular majority vote, in violation of the Guarantee Clause of the U.S. Constitution; and 4) it violates the Equal Protection Clause of the U.S. Constitution. We reject each of these claims.

■ Murtishaw's first claim, that Section 27 deprived him of a "right" to be free of the death penalty, is without merit. In making this claim, Murtishaw is unclear about what type of "right" he is asserting. It is beyond doubt that all people protected by the Constitution have a right not to be deprived of their lives without due process of law. *See* U.S. Const. amend. 5, 14. However, Section 27 did not deprive Murtishaw of that right, just as it did not deprive any other California resident of that right.

Rather than depriving him of a "right to life," Section 27 deprived Murtishaw of an interpretation of the unamended California Constitution that would have been favor-

able to him. *Anderson* held that the sentence of death was "cruel" and thereby prohibited by the California Constitution, before it was amended by Section 27. *See Anderson,* 6 Cal.3d at 653–56, 100 Cal. Rptr. 152, 493 P.2d 880. Section 27 amended the state constitution, such that the imposition of the death penalty was no longer "cruel." Murtishaw is objecting to this change. Murtishaw's claimed "right," when properly construed, is therefore not a right to be free of the death penalty, but rather is a claimed "right" to have a constant interpretation of the California Constitution without amendment. There is, however, no support for an argument that federal due process demands constant interpretation of a state constitution, and Murtishaw does not assert any. His claim therefore fails.

■ Murtishaw next argues that Section 27 violated California's separation of powers principles because it purported to enact laws and to demand a specific interpretation of those laws. According to Murtishaw, this alleged violation of California's separation of powers principles consequently violates federal due process.

■ Murtishaw's first premise, that Section 27 violated the separation of powers principle embodied in the California constitution, is wrong. The California Supreme Court has held that Section 27 did not exempt California's death penalty statute from judicial review under the California Constitution; rather, Section 27 "states simply that 'such punishment'—i.e., death—shall not be deemed to contravene state constitutional provisions." *People v. Superior Court (Engert),* 31 Cal.3d 797, 807, 183 Cal.Rptr. 800, 647 P.2d 76 (1982). Moreover, Murtishaw's second premise—that a state's violation of its own separation of powers principles is a violation of federal due process—lacks support. Murtishaw cites Supreme Court precedent that

recognize the importance of separation of powers principles, *see Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995); but this precedent can hardly be said to establish a substantive federal right in every citizen to have a state government that honors separation of powers principles. Section 27 does not violate federal due process.

■ Murtishaw also argues that both the alleged separation of powers violation, and the initiative method by which Section 27 was passed, violated the Guarantee Clause of Article IV, section 4 of the Federal Constitution. A challenge based on the Guarantee Clause, however, is a non-justiciable political question. *See New York v. United States*, 505 U.S. 144, 184, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Pacific States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118, 146, 32 S.Ct. 224, 56 L.Ed. 377 (1912). We therefore deny Murtishaw's Guarantee Clause claim.

■ Finally, Murtishaw argues that Section 27 denies him equal protection because it subjects him to a law that cannot be challenged under the state constitution, whereas other individuals are subject to laws that can be challenged under the state constitution. Again, the California Supreme Court has held that the California death penalty statute is reviewable under the California constitution. *See People v. Superior Court (Engert)*, 31 Cal.3d 797, 807, 183 Cal.Rptr. 800, 647 P.2d 76 (1982). Because Murtishaw is not in fact subject to a state law that cannot be reviewed under the state constitution, his equal protection claim fails.

We reject Murtishaw's facial challenge to the California death penalty statute.

## VII. VIOLATION OF THE EX POST FACTO CLAUSE

In addition to his facial challenge to California's death penalty statute, Murtishaw argues that he was sentenced to death under the provisions of a 1978 statute that was not in existence at the time of the events of the crime with which he is charged, and that this violates the ex post facto provisions of the United States Constitution.

■ Murtishaw committed the acts with which he is charged on April 9, 1978. At this time, the death penalty statute passed by the California Legislature in 1977 ("the 1977 statute") was still in effect. *See Murtishaw II*, 48 Cal.3d at 1025, 258 Cal.Rptr. 821, 773 P.2d 172. Later in 1978, the Briggs death penalty initiative ("the 1978 statute") passed and became effective. *See id.* (citing *People v. Easley*, 34 Cal.3d 858, 883, 196 Cal.Rptr. 309, 671 P.2d 813 (Cal.1983)). The trial court at the penalty retrial in 1983, however, instructed Murtishaw's jury based on the bare language of the 1978 statute, rather than the 1977 statute. The trial court therefore erred by giving the jury instructions based on the 1978 statute. *See id.*

This error requires reversal of Murtishaw's death sentence. Under the 1977 statute the jury would have had discretion to reject the death penalty even if it found that the aggravating factors outweighed the mitigating factors. However, under the bare language of the 1978 statute the jury did not have this discretion. Indeed, under the plain language of the 1978 statute, if aggravating circumstances even slightly outweighed mitigating circumstances, death was mandatory. Therefore, in instructing the jury based on the bare language of the 1978 statute, which was more onerous than the requirements of the 1977 statute, an ex post facto violation resulted.

The 1977 death penalty statute, which should have been the source of the instructions given to Murtishaw's jury, reads as follows:

After having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole.

*People v. Easley,* 34 Cal.3d 858, 881 n. 13, 196 Cal.Rptr. 309, 671 P.2d 813 (Cal.1983) (quoting former Cal.Penal Code § 190.3). By contrast, the trial court gave Murtishaw's jury the following instructions, based on the 1978 statute:

After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

If you conclude that the aggravating circumstances outweigh the mitigating circumstances you *shall impose* a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole.

(emphasis added); *see also Easley,* 34 Cal.3d at 881 n. 12, 196 Cal.Rptr. 309, 671 P.2d 813 (quoting former Cal.Penal Code § 190.3).

In *People v. Easley,* 34 Cal.3d 858, 196 Cal.Rptr. 309, 671 P.2d 813 (Cal.1983), the defendant, Easley, committed his crimes before the enactment of the 1978 death penalty statute, but Easley's sentencing jury was given instructions based on the 1978 law. *See id.* at 881, 196 Cal.Rptr. 309, 671 P.2d 813. The California Supreme court held that this error necessitated reversal because "on balance, the 1978 version is much less favorable than the 1977 provision." *Id.* at 884, 196 Cal. Rptr. 309, 671 P.2d 813. This result ob-

tained because the "erroneous instruction deprived defendant of the opportunity to have the jury exercise the discretion that the 1977 statute provided when aggravation outweighs mitigation." *Id.*

The California Supreme Court visited a similar issue in *People v. Brown,* 40 Cal.3d 512, 230 Cal.Rptr. 834, 726 P.2d 516 (Cal. 1985), *rev'd on other grounds,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). However, in that case the crime was committed after the enactment of the 1978 law, and thus, it properly applied to Brown's case. Brown's contention was not that the wrong statute was applied, as in Murtishaw's case, but rather that the 1978 statute was itself unconstitutional. He contended that the 1978 statute improperly mandated that a jury return a death verdict if the aggravating factors outweighed the mitigating factors. The California Supreme Court agreed with the defendant that the statute would not pass constitutional muster "if it required jurors to render a death penalty verdict on the basis of some arithmetic formula, or if it forced them to impose death on any basis other than their own judgment that such a verdict was appropriate under all the facts and circumstances of the individual case." *Id.* at 540, 107 S.Ct. 837. The California court avoided the constitutional question and held that the 1978 statute could be interpreted so as to allow a jury to return a life sentence even if it finds that aggravation outweighs mitigation. *See id.* at 541, 107 S.Ct. 837. Thus, in effect, the court interpreted the plain language of the 1978 statute that the jury *"shall"* impose the death penalty if aggravating circumstances outweigh mitigating circumstances, to really mean "may." Understandably, the court went on to require that, in the future, in order to avoid confusion, juries be given an instruction that explicitly tells them of the discretion they have to reject the death

penalty. *See id.* at 544 n. 17, 107 S.Ct. 837.

> [T]rial courts in future death penalty trials—in addition to the instruction called for by *Easley* [22] [ ] should instruct the jury as to the scope of its discretion and responsibility in accordance with the principles set forth in this opinion.

The principles set for this opinion were summarized to be

> By directing that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the "weighing" process, he decides that death is the appropriate penalty under all the circumstances.

*Id.* at 541, 107 S.Ct. 837.

Neither of the clarifying instructions required by *Brown* or *Easley* were given in Murtishaw's case as both were decided after his sentencing trial. As to even the cases in which the 1978 statute was properly applicable the *Brown* court stated:

> We pass no judgment on the validity of death penalty verdicts previously rendered without benefit of the Easley instruction or the instruction we now require. Each such prior case must be examined on its own merits to determine whether, in context, the sentencer may have been misled to the defendant's prejudice about the scope of its sentencing discretion under the 1978 law.

40 Cal.3d at 544 n. 17, 230 Cal.Rptr. 834, 726 P.2d 516. The *Brown* court noted that 170 capital cases had been decided during the seven years since the enactment in which the 1978 law was properly applicable. It is easy to see the turmoil had the 1978 statute been declared facially unconstitutional. It is also interesting to note that in the *Brown* case itself the defendant's death penalty sentence was reversed on another ground, thus the holding that the 1978 statute was constitutional did not result in upholding his death penalty sentence. In fact the court did not examine the effect it had on his sentence, it only held that the 1978 statute was facially constitutional.

It is important to note the significant distinction between *Easley* where a 1978 statute was improperly applied in instructing the jury and those cases foreseen by *Brown* where the correct 1978 statute was applied in giving possibly misleading instructions. Murtishaw's case is akin to the *Easley* case and each involve an ex post facto application of the 1978 statute. The court in *Brown* noted: "Certainly the 1978 instruction given in *Easley* was prejudicial when compared to its 1977 counterpart, since the latter, unlike the former, contained no unexplained use of mandatory language." *Id.* at 545, 230 Cal.Rptr. 834, 726 P.2d 516.

The California Supreme Court considered Murtishaw's argument that sentencing under the 1978 statute was unconstitutional and rejected his claim in a 4 to 3 decision. *People v. Murtishaw,* [*Murtishaw II* ], 48 Cal.3d 1001, 258 Cal.Rptr. 821, 773 P.2d 172 (Cal.1989). The court noted that *Easley* held that the 1978 law was "prejudicially dissimilar" from the 1977 law, but nevertheless concluded that since *Easley* the court has "made clear that the

---

**22.** The instruction called for in *Easley* is

> [T]rial courts—in instructing on the factor embodied in section 190.3 subdivision (k)—should inform the jury that it may consider as a mitigating factor "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime" and "any other aspect of the defendant's character or record ... that the defendant prefers as a basis for a sentence less than death." *Lockett, supra.* 438 U.S. at p. 604, 98 S.Ct. 2954 (57 L.Ed.2d at p. 990).

1978 statute provides a range of sentencing discretion no less favorable to a defendant than its 1977 counterpart." *Id.* at 1026, 258 Cal.Rptr. 821, 773 P.2d 172. The court relied heavily on its interpretation of the 1978 law in *Brown,* and held that "a 1978–law sentencer [has] the same range of potential mitigating evidence and the same broad leniency and mercy afforded a 1977–law jury." *Id.* at 1027, 258 Cal.Rptr. 821, 773 P.2d 172. However, this interpretation of the statute rendering "shall" to really mean "may" and the accompanying clarifying instruction came after Murtishaw's sentencing.

■ The California Supreme Court's interpretations of California law "are binding on this court unless we determine such interpretations to be untenable, or a veiled attempt to avoid review of federal questions." *Powell v. Ducharme,* 998 F.2d 710, 713 (9th Cir.1993). The California Supreme Court in *Brown* and *Murtishaw II* held that the 1978 law gives juries the same discretion as the 1977 law to sentence a defendant to life in prison, rather than death, even if the aggravating factors outweigh the mitigating factors. However, the interpretation and required clarifying instruction that render the 1978 statute virtually the same law as the 1977 statute did not come until after Murtishaw's sentencing. This subsequent interpretation was of no consequence nor assistance to Murtishaw's jury which relied solely on the bare language of the 1978 statute without any clarifying instruction. Thus, although the 1978 statute which applies only prospectively, is not, as interpreted under *Brown* ex post facto on its face, it is ex post facto as applied to Murtishaw.

The California Supreme Court rejected Murtishaw's ex post facto claim based on its conclusion that under its interpretation of the 1978 statute (subsequent to Murtishaw's sentencing), the 1978 statute was the same basic law as the 1977 statute.

However, as applied to Murtishaw in its bare language without the benefit of the now required clarifying instruction, the 1978 statute drastically differs from the 1977 statute. The 1977 statute instructed the jury to "consider, take into account and be guided" by the statutory aggravating and mitigating factors, without any further direction or restraint on the jury's choice between life and death. In stark contrast, the plain language of the 1978 statute provides that if the jury finds the aggravating circumstances outweigh mitigating circumstances, it *shall* impose death.

It is clear that the 1977 statute applied to Murtishaw's offense, yet the trial court applied the 1978 statute and in his trial quoted the exact language of the 1978 statute in instructions to the jury. That statutory language stated that "If you conclude that the aggravating circumstances outweigh the mitigating circumstances you *shall impose* the death penalty." (Emphasis added).

Generally, to evaluate how a jury might have interpreted an instruction, the California Supreme Court focuses on the plain meaning of the language in the instruction. *See People v. Davis,* 10 Cal.4th 463, 521, 41 Cal.Rptr.2d 826, 896 P.2d 119 (1995). Despite the fact that Murtishaw's jury received only the bare language of the statute without the now mandatory clarifying instruction, and despite the fact that the *Murtishaw II* court stated that a jury applying the 1978 law "must believe aggravation is *so relatively great, and mitigation so comparatively minor, that the defendant deserves death" Murtishaw II,* 48 Cal.3d at 1027, 258 Cal.Rptr. 821, 773 P.2d 172 (emphasis added), the court found no *ex post facto* violation.

■ In applying the ex post facto prohibition of the Federal Constitution to state laws, a federal court accepts the

meaning ascribed to them by the highest court of the state. *See Lindsey v. Washington*, 301 U.S. 397, 400, 57 S.Ct. 797, 81 L.Ed. 1182 (1937). But when their meaning is thus established, the issue of "whether the standards of punishment set up before and after the commission of an offense differ, and whether the later standard is more onerous than the earlier within the meaning of the constitutional prohibition, are federal questions which this Court will determine for itself." *Id.* To answer these questions, a reviewing court must compare the practical operation of the two statutes as applied to petitioner's offense. *Id.*

Recently, in *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), the Supreme Court recounted its "best knowledge of the original understanding" of the ex post facto clause:

> It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.

*Id.* at 42, 110 S.Ct. 2715 (citing *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925)). The Court further noted that "enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty." *Id.* (quotation omitted).

Taking discretion away from a sentencer violates the *Ex Post Facto* clause. *See Lindsey v. Washington*, 301 U.S. 397, 401, 57 S.Ct. 797, 81 L.Ed. 1182 (1936). In *Lindsey*, a change in the law made the sentence by a court a mandatory fifteen years and took away the court's power to exercise its discretion in setting the maximum at between six months and fifteen years. *See id.* at 397–400, 57 S.Ct. 797. The removal of this discretion constituted an *ex post facto* violation because the *Ex Post Facto* clause looks to the standard of punishment prescribed by the statute rather than that actually imposed. Ironically, to illustrate its point, the Court in *Lindsey* stated, "[i]t could hardly be thought that, if a punishment for murder of life imprisonment or death were changed to death alone, the latter penalty could be applied to homicide before the change." *Id.* at 401, 57 S.Ct. 797.

Similarly, in *United States v. Johns*, 5 F.3d 1267, 1272 (9th Cir.1993), we held that removal of discretion from the sentencer violated the *Ex Post Facto* clause even if " 'the sentence [the defendant] received under the new law was not more onerous than that which he *might* have received under the old.' " *Id.* at 1272 (citing *Dobbert v. Florida*, 432 U.S. 282, 300, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (emphasis added)).

In reviewing an ex post facto challenge, a court must compare the practical operation of the two statutes as applied to petitioner's offense. *Lindsey*, 301 U.S. at 399, 57 S.Ct. 797. In *Lindsey*, the Court said that the effect of a new statute which removed a sentencer's discretion was to make mandatory what was before only the maximum sentence. *Id.* at 400, 57 S.Ct. 797. Here, the bare language of the 1978 statute could be construed as removing the jury's discretion to impose life without parole rather than death if aggravating circumstances even slightly outweighed mitigating circumstances. The 1977 statute had no such mandatory language or any direction of when the jury "shall" impose the death penalty. Therefore, despite the fact that the jury might have sentenced Murtishaw to death under the 1977 stat-

ute, the removal of this discretion constitutes, under *Lindsey* and *Johns,* an ex post facto violation. *See also Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987).[23]

The California Supreme Court concluded that "[i]f the sentencer's discretion under the 1978 law, *properly construed,* is essentially the same as under the 1977 law, it is no more inherently 'confusing' or 'prejudicial' to give 1978–law sentencing instructions in a 1977–law case than in a 1978–law case." *Murtishaw II,* 48 Cal.3d at 1028, 258 Cal.Rptr. 821, 773 P.2d 172 (emphasis added). However the statute was not "properly construed" to the jury in Murtishaw's case. The jury was instructed with only the bare language of the 1978 statute. No clarifying instruction was given, which has since been required by the California Supreme Court in *People v. Brown,* 40 Cal.3d at 544 n. 17, 230 Cal. Rptr. 834, 726 P.2d 516. In comparing the 1977 statute with not only the bare language of the 1978 statute, but also the state court's interpretation of the jury's discretion under the 1978 statute in this very case, (that to impose death the sentencer must find aggravating circumstances so substantially outweigh mitigating circumstances that death is proper), we find it impossible to justify this conclusion that the discretion was essentially the same under these circumstances.

As interpreted by the California Supreme Court, and as explained with the now mandatory clarifying instruction, the 1978 statute might be essentially the same as the 1977 statute. However, the bare language of the 1978 statute, as applied to Murtishaw, is starkly different from the 1977 statute.

In *Miller,* the Supreme Court stated that to constitute an *ex post facto* violation, a law must be (1) retrospective, meaning that it applies to events occurring before its enactment, and (2) "it must disadvantage the offender affected by it." *Miller,* 482 U.S. at 430–31, 107 S.Ct. 2446 (quoting *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)). The Court concluded that although the revised sentencing guideline law was prospective, application of the revised sentencing guideline to Miller satisfied the retrospective requirement. The court also found that the second requirement was not foreclosed simply because a defendant could have received the same sentence under the old law. *Id.* at 432, 107 S.Ct. 2446. Thus, here, the fact that the jury could have imposed the death penalty under the 1977 statute, and the fact that the statute is a prospective one does not foreclose Murtishaw's *ex post facto* claim. As to Murtishaw it was applied retrospectively.

Additionally, we disagree with the California Supreme Court's conclusion that its subsequent interpretation of the 1978 statute to mean essentially the same as the 1977 statute, forecloses Murtishaw's *ex post facto* claim. In *Weaver,* 450 U.S. at 29, 101 S.Ct. 960, the Court, under the *Ex Post Facto* clause, held a statute void as applied to a defendant who committed crimes prior to its enactment. *Id.* at 36, 101 S.Ct. 960. The Court stated that the critical question was whether the statute changed the legal consequences of acts completed before its effective date. The Court concluded that in the context of that

---

**23.** In *Miller,* the legislature increased the presumptive sentencing range for the defendant's crime after the crime was committed. *Id.* at 425–28, 107 S.Ct. 2446. The sentencing judge could depart from the range if clear and convincing reasons for doing so were given in writing. *Id.* at 426, 107 S.Ct. 2446. The Court concluded that even if judges could depart upon making the appropriate findings by clear and convincing evidence, the defendant's sentence was directly and adversely affected. *Id.* at 435, 107 S.Ct. 2446.

case, it did because the State applied a 1979 statute to a petitioner convicted of a crime occurring in 1978. *Id.* at 31, 101 S.Ct. 960.[24]

The Eighth and Fifth Circuits have also held that application of federal sentencing guideline amendments that were not in force when the defendant committed the offense violates the *Ex Post Facto* clause. *U.S. v. Swanger*, 919 F.2d 94, 95 (8th Cir.1990); *U.S. v. Suarez*, 911 F.2d 1016, 1021–22 (5th Cir.1990).

Here, the California Supreme Court's interpretation of the 1978 statute could save it from *ex post facto* challenges when the clarifying instruction makes clear that the jury's discretion remains the same as it was under the 1977 statute. As applied to Murtishaw, however, who was sentenced prior to the state court's saving interpretation of the statute and hence without any clarifying instruction regarding the jury's discretion, the stark contrast between the plain language of the 1978 and the 1977 statutes reveals an *ex post facto* violation.

■ One of the principal interests that the *Ex Post Facto Clause* was designed to serve was fundamental justice. *Carmell v. Texas*, 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000). "There is plainly a fundamental fairness interest, even apart from any claim of reliance or notice, in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life." *Id.* at 533, 120 S.Ct. 1620. Murtishaw committed his acts at the time the 1977 statute was in effect, and so as a point of fundamental fairness and constitutional law, the law in place at that time should have been applied to his sentencing. Especially where,

as here, the 1977 statute not only imposed a different standard from that potentially interpreted under the bare language of the 1978 statute, but also would have avoided any of the potential for confusion that existed under the unadorned 1978 statute. Thus, fundamental fairness dictates that the government play by the rules it established under the circumstances to deprive Murtishaw of his life.

■ The proper relief upon a conclusion that a state prisoner is being treated under an *ex post facto* law is to remand to permit the state court to apply the law in place when his crime occurred. *Weaver*, 450 U.S. at 36–37 n. 22, 101 S.Ct. 960 (citing *Lindsey*, 301 U.S. at 402, 57 S.Ct. 797). Accordingly, we reverse Murtishaw's death sentence and remand the case to the state court to sentence him under the 1977 statute.

*Constitutionally Erroneous Instruction*

■ Additionally, Murtishaw's sentence must be reversed because the jury instructions were constitutionally erroneous. In *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the Court established a standard of review for reversible error where the jury instruction given was ambiguous. This standard requires a reviewing court to determine whether there is a "reasonable likelihood" that the jury was misled. *See Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190). This is the standard the California court applied in reviewing Murtishaw's claim. This standard does not apply here because Murtishaw's instructions were not merely ambiguous, they were clearly erroneous as

24. In *Weaver*, an inmate who performed satisfactory work and avoided disciplinary violations could obtain more gain time per month under the repealed provision than for the same conduct under the new provision. The Court concluded that the new provision constricted the opportunity for early release and thus made the punishment more onerous, and an *ex post facto* violation.

he should have been sentenced under the 1977 statute. *See Boyde,* 494 U.S. at 380, 110 S.Ct. 1190 (distinguishing the test to apply where an instruction is ambiguous from that which applies where an instruction is concededly erroneous).

 To establish that a jury instruction was clearly erroneous rather than ambiguous, one must show that the jury was instructed that it could convict based on legally impermissible grounds. *See Boyde,* 494 U.S. at 380, 110 S.Ct. 1190. Instructing the jury using the plain language of the 1978 statute with no clarification or explanation, gave the jury the wrong instruction. Because the jury should have received the more discretionary 1977 instructions but instead was instructed with the unadorned 1978 instructions, it could have returned a verdict of death based on a belief that it was legally required under the statute's "shall impose" language. Thus, the jury could have based its verdict on an impermissible legal theory.

The jury instruction was not only literally erroneous, as Murtishaw's jury was given the wrong statute to apply, but also allowed Murtishaw to be sentenced under a "legally impermissible" standard. Thus, the decision here falls not under the *Boyde* standard, but under the clearly erroneous standard of *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), which requires that the sentence be set aside. As *Boyde* stated:

> In some instances, to be sure, we have held that "when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction be set aside." (Quoting *Stromberg* ). *In those cases, a jury is clearly instructed by the court that it may convict a defendant on an impermissible legal theory,* as well as on a proper theory or theories. *Although it is possible that the guilty verdict may have had a proper basis, "it is equally likely that the verdict . . . rested on an unconstitutional ground," and we have declined to choose between two such likely possibilities.*

494 U.S. at 379–80, 110 S.Ct. 1190 (internal citations omitted) (emphasis added).

Additionally, in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the Supreme Court held that a jury's verdict must be set aside if it could be supported on one ground but not the other and the reviewing court is uncertain which the jury relied on. *Id.* at 376, 108 S.Ct. 1860. Review of death sentences demands even greater certainty that the jury's conclusion rested on proper grounds. Accordingly, Murtishaw's sentence should be set aside as it is impossible to determine whether the jury sentenced Murtishaw to death under a confused and incorrect interpretation of the concededly wrong statute. It is difficult to imagine circumstances to better demonstrate a miscarriage of justice than having to guess whether a jury would have imposed the death penalty had it been given the proper instruction.

Even applying the *Boyde* standard here, under the circumstances, we disagree with the conclusion that there was no reasonable likelihood that the jury was misled. The jury took over two days to deliberate, asked twice for the definition of first degree murder and at one point asked to rehear Laufenburger's testimony. Additionally, among the jury's requests during deliberation, were the judge's instructions, indeed the erroneous instructions at issue here.[25]

---

25. Moreover, the Judge instructed the jury "you must accept and follow the rules of law as I state them to you." Assuming the jury took this instruction seriously, it becomes even more likely that the jury was misled and

■ The jury received no instructions beyond the bare language of the 1978 statute. As such, the jury was instructed that "if you conclude the aggravating circumstances outweigh the mitigating circumstances you *shall* impose a sentence of death." (emphasis added). The arguments made by counsel in this case did not obviate the clarity of the "shall impose" instruction. Although the California Supreme Court observed that "both counsel's arguments made clear that the jury was to weigh the various sentencing factors as it chose and must ultimately decide for itself which penalty defendant deserved under all the circumstances," *Murtishaw II*, 48 Cal.3d at 1030, 258 Cal.Rptr. 821, 773 P.2d 172, counsel's arguments alone cannot salvage a legally erroneous instruction. This is particularly true given California's general approach to evaluating a jury's interpretation of an instruction based on the plain meaning of the language and the judicial presumption that jurors follow the court's instructions as law and consider attorneys' statements to be advocates' arguments.[26] *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). Additionally, nothing in the record indicates that either attorney clarified that the court's "shall" instruction did not mandate a sentence of death if the aggravating circumstances even slightly outweighed the mitigating circumstances.

On these facts and the court's meager discussion with regard to the jury's understanding of the erroneous instruction we disagree with the conclusion that the jury could not have been misled. We conclude that *Stromberg* provides the appropriate analysis to this clearly erroneous instruc-

tion, and requires reversal of Murtishaw's death sentence.

## Due Process

### A. Sentencing Murtishaw under the wrong statute violated due process

■ The sentencing process, as well as trial itself, must satisfy requirements of the due process clause. *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). A defendant has a legitimate interest in the character of the procedure which leads to the imposition of the sentence. *Id.* Furthermore, the Supreme Court has recognized that death is a different kind of punishment from any other which may be imposed in this country, and as such, this sentence requires greater scrutiny than others.

■ Sentencing a defendant under the wrong statute may itself be a due process violation when the jury's proper discretion is impaired. In *Hicks v. Oklahoma*, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), the defendant was sentenced under a habitual offender statute mandating a forty year sentence, which the jury imposed. Subsequent to the sentencing the Oklahoma courts found the statute to be unconstitutional. Nevertheless, the state appellate courts affirmed the conviction and sentence holding that Hicks was not prejudiced by the impact of the invalid statute because the sentence was within the range of punishment that could have been imposed in any event.

The Supreme Court vacated and remanded, stating:

> Where ... a state has provided for the imposition of criminal punishment in the

---

sentenced Murtishaw to death on legally impermissible grounds.

**26.** In comparing lawyers' arguments and court instructions, *Boyde* noted that the for-

mer are usually matters of argument, not evidence and are likely viewed as the statements of advocates, while the latter are viewed as "definitive and binding statements of law." *Id.* at 384, 110 S.Ct. 1190.

discretion of the trial jury .... *the defendant has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion,* and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.

*Hicks,* 447 U.S. at 346, 100 S.Ct. 2227 (internal citations omitted). The court concluded that Oklahoma had denied the petitioner the jury sentence to which he was entitled under state law, "simply on the frail conjecture that a jury might have imposed a sentence equally as harsh as that mandated by the invalid ... provision." *Id.* The Court stated that *"[s]uch an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law." Id.* (emphasis added).

█ Here, similar to the Oklahoma court in *Hicks,* the California Supreme Court, despite having found error in the trial court's having instructed the jury under the 1978 Briggs statute, concluded that Murtishaw was not prejudiced by the mandatory language not found in the applicable 1977 statute because the jury understood that both statutes provided the same jury discretion. The 1978 statute contains a provision that if the jury finds that aggravating circumstances outweigh mitigating circumstances, then it *shall* apply the

death penalty. No similar provision can be found in the 1977 statute under which Murtishaw should have been sentenced.

In concluding that this conceded error was harmless, the California court seemed to solely rely on the attorneys' arguments at trial discussing the weighing of factors as having clarified any potential confusion. Aside from the attorneys' statements, none of which included any clarification that the "shall" in the 1978 statute really meant "may", the jury received only the bare, seemingly mandatory language of the statute.[27] In light of the plain language of the statute, the judicial presumption that jurors follow the instructions of the court rather than the attorneys,[28] and the fact that neither attorney made any clarification with regard to the plain and apparent mandatory language, under *Hicks,* this error that the California Supreme Court deemed harmless, will deprive petitioner of his life by the jury's potential confusion over the exercise of its statutory discretion. Such an arbitrary deprivation of life violates due process.

*Jones v. State of Arkansas,* 929 F.2d 375 (8th Cir.1991), also noted this due process issue. Similar to Murtishaw, Jones argued that he was denied due process because he was sentenced under a statute that was not in effect at the time he committed his crime. *Id.* at 377. Rejecting the state's

27. Additionally, in cases where the court had to determine how a jury might have interpreted instructions, the California Supreme Court seemed to generally focus on the "plain meaning" of the language in the instruction. *See People v. Davis,* 10 Cal.4th 463, 521, 41 Cal.Rptr.2d 826, 896 P.2d 119 (1995). Yet, here the court concluded that despite the plain meaning of the word "shall," the jury probably interpreted it to mean "may".

28. The Supreme Court has repeatedly stated that it "presumes that jurors, conscious of the gravity of their task, attend closely to the particular language of the trial court's in-

structions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

In *Wade v. Calderon,* 29 F.3d 1312 (9th Cir.1994), the Ninth Circuit noted that if other instructions and the ordinary meaning of the word in question were not sufficient to cure an instruction that was erroneous on its face, "then the prosecutor's closing argument surely cannot do so." *Id.* at 1321. The *Wade* court cited *Boyde* as further support for this conclusion. The *Murtishaw II* court did not address this.

argument that the use of the wrong sentencing statute was harmless error, the Eighth Circuit held that sentencing under a statute which was not in force when petitioner committed his offenses, violated the *ex post facto* clause of the Constitution. *Id.* at 378, 380. The court added that sentencing a defendant under the wrong statute may itself be a due process violation when the jury's proper discretion is impaired. *Id.* at 380, n. 14. (citing *Hicks* ).[29]

**B. Standard for reversal for instructional error on habeas review**

■■■ Instructional error will not support a petition for federal habeas relief unless it is shown "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' " *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), but that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 147, 94 S.Ct. 396.

This standard for instructional error applies to ambiguous or omitted instructions. Murtishaw's circumstance is different because the trial court applied the wrong statute. *Hicks* was not a habeas case and did not apply this rigorous standard. *Jones* was a habeas case challenging an instruction in sentencing and applied harmless error review, but did not apply the instructional error standard discussed here. Our Court, however, has applied the *Cupp* standard to instructions given at the sentencing phase. *See Jeffries v. Blodgett,* 5 F.3d 1180, 1195 (9th Cir.1993).

Henderson v. Kibbe, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) stated the rarity of the case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction itself violates due process," not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned,' ".

*Id.* at 154, 97 S.Ct. 1730 (citing *Cupp v. Naughten,* 414 U.S. at 147, 94 S.Ct. 396). In evaluating Henderson's claim that the omission of an instruction on causation violated his Fourteenth Amendment right to due process, the Court stated that "[t]he significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given." *Id.* at 156, 94 S.Ct. 396. The *Henderson* court noted that an "omission, or an incomplete instruction, *is less likely to be prejudicial than a misstatement of the law." Id.* at 155, 97 S.Ct. 1730 (emphasis added).

■■■ If the *Henderson* standard does apply to Murtishaw's claim, it is important to note that Murtishaw involves a misstatement of law as the trial court instructed the jury of a statute that did not apply to Murtishaw. As *Henderson* noted, such

**29.** Also notable is that Justice Scalia has commented on this issue. In *McKoy v. North Carolina,* 494 U.S. 433, 460 n. 1, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (Scalia, J., dissenting), Justice Scalia stated that even in a capital case, ambiguous jury instructions did not violate the Eighth Amendment simply because they are ambiguous, "but they do violate the Due Process Clause *if they misstate the law to the defendant's detriment—and it is not essential to that violation that the law as misstated be an unconstitutional law."* (emphasis added).

a misstatement is more likely to be prejudicial than an omission or incomplete instruction. Additionally, comparing the 1978 Briggs statute that the trial court used and the 1977 statute that actually applied to Murtishaw reveals a stark difference and prejudice to Murtishaw as the 1977 provision contained no mandatory language like that of the 1978 statute. Still, the California Supreme Court deemed this harmless error because subsequent to Murtishaw's trial, the state supreme court interpreted the 1978 statute to allow the same jury discretion as that under the 1977 statute.

In rendering its interpretation of the 1978 statute, the California court required that a clarifying instruction be given to the jury explaining the discretion ambiguity. Murtishaw's sentencing jury did not receive any clarification of this ambiguous statute that admittedly did not even apply to Murtishaw. Had the jury been given the applicable 1977 statute, *no* ambiguity over the language of the 1978 statute would have arisen. Application of the wrong statute potentially confused the jury as to its exercise of statutory discretion. Thus, even under *Henderson*'s strict standard, Murtishaw demonstrates that application of the wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or death sentence. Such an error resulted in the arbitrary deprivation of life and thus a violation of due process.[30]

The Eighth Circuit has interpreted the instructional error standard to require that a defendant show that "the instructions used constituted a fundamental defect that resulted in a miscarriage of justice." *Robinson v. LaFleur*, 225 F.3d 950, 954 (8th

Cir.2000). It is difficult to imagine circumstances to better demonstrate a miscarriage of justice than having to guess whether a jury would have imposed the death penalty had it been given the proper instruction.

*Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) held that the sentence of death could not be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included noncapital offense, provided that the evidence would have supported such a verdict. The Court stressed that the jury was faced with a situation in which its choices were only to convict the defendant and sentence him to death or find him not guilty. The jury could not take a third option of finding that although the defendant had committed a grave crime, it was not so grave as to warrant capital punishment. The Court concluded that a jury might have convicted Beck but also might have rejected capital punishment if it believed Beck's testimony. On those facts the Court held that the defendant was entitled to a lesser included offense instruction as a matter of due process. *Id.* at 637, 100 S.Ct. 2382.

Here, under the plain mandatory language of the statute, Murtishaw's jury might have believed it had no alternative to imposing the death penalty if it found aggravating circumstances even slightly outweighed mitigating circumstances. This would not have been the case under the 1977 statute, nor even under the California Supreme Court's subsequent interpretation of the 1978 statute. As in *Beck,* when it is a sentence of death to be imposed, such a mistaken ultimatum present-

---

30. *Estelle v. McGuire,* 502 U.S. 62, 71, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Cupp,* 414 U.S. at 147, 94 S.Ct. 396), stated that "[t]he only question for us is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"

ed to the jury constitutes a miscarriage of justice and violates due process.

The mere fact that we have found an error of constitutional dimension in the jury instructions does not, however, automatically warrant a grant of the habeas petition. *See Calderon v. Coleman*, 525 U.S. 141, 145, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998). We now must determine whether that error was harmless. *See id.* We conclude that it was not.

■ An instruction that was reasonably likely to have been misunderstood by the jury is subject to a harmless error analysis, because it is a trial-type error that "occurred during the presentation of the case to the jury." *Arizona v. Fulminante*, 499 U.S. 279, 307, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). *See also Coleman*, 525 U.S. at 145, 119 S.Ct. 500 (holding that habeas courts must apply a harmless error analysis after having found that jury instructions were constitutionally erroneous under *Boyde*); *Clemons v. Mississippi*, 494 U.S. 738, 752–54, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (finding that unconstitutionally overbroad jury instructions at the sentencing stage of a capital case are subject to harmless error review). Because this case involves a petition for habeas corpus, and because the improper jury instruction was a trial-type error, *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), controls. *See Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir.2000). Under *Brecht*, the inquiry "is whether, in light of the record as a whole," the improper jury instruction "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638, 113 S.Ct. 1710.

■ It is difficult to determine whether the erroneous jury instruction had a substantial and injurious effect or influence on the jury's verdict. The jury obviously found that the aggravating factors outweighed the mitigating factors—otherwise it would not have returned a sentence of death. However, it is unclear whether the jury would have returned a death sentence had they been given the correct instruction, properly informing them that they could return a life sentence even if aggravation outweighed mitigation. In order to make this determination, we must examine the record as a whole. *See id.*

Murtishaw's penalty jury was presented with a wide array of both aggravating and mitigating evidence. The State presented evidence of Murtishaw's guilt, as well as evidence that discredited Murtishaw's diminished capacity defense. Murtishaw presented character evidence that described him as "likeable," "very level-headed" and a "good guy." He also entered evidence that detailed his difficult childhood and family history, and that substantiated his claim that he had used drugs the night before the shootings. Most importantly, Murtishaw presented expert testimony that suggested he had committed the shootings while suffering from a diminished capacity due to brain disorders and drug and alcohol intoxication.

The jury deliberations suggest that the jury was at least partially persuaded by Murtishaw's mitigating evidence. On two occasions during its deliberations, the jury asked the court for a definition of first degree murder. The jurors also asked to review some of the physical evidence from the crime scene and to have some of the testimony concerning Murtishaw's alleged PCP intoxication re-read to them. The deliberations lasted for two days before the jury returned the death sentence.

■ We, of course, cannot determine whether the jury would have exercised leniency had it been given that option; the very nature of such a question would require us to determine whether the jury felt mercy for Murtishaw, even though it felt

justified in imposing a death sentence. Because we cannot actually determine whether the jury would have exercised leniency, we cannot determine, one way or the other, whether the failure to give the jury that option resulted in "actual prejudice" to Murtishaw. *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (stating that habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice' "). Nonetheless, given the mitigating evidence presented, the jury's apparent interest in it, and the length of the jury's deliberations, we are in "grave doubt" about whether the jury would have returned a death sentence even if they had been properly instructed that they did not have to do so after finding that aggravation outweighed mitigation. *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) ("By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."). When, in a federal habeas proceeding, we are "in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless." *Id.* at 436, 115 S.Ct. 992; *Bonin v. Calderon,* 59 F.3d 815, 824 (9th Cir.1995) (noting that where "a court finds itself utterly unable to determine whether the error was harmless ... the court should not treat the error as harmless"). We therefore hold that the erroneous instruction that the jury "shall" return a death sentence if aggravation outweighed mitigation was reasonably likely to have violated Murtishaw's constitutional rights, and that the violation was not harmless. Consequently, we reverse the district court's denial of the habeas petition with regard to Murtishaw's death sentence.

## CONCLUSION

We affirm the district court's denial of Murtishaw's petition for habeas corpus insofar as Murtishaw's guilt conviction is concerned. However, we conclude that a 1978 statute was improperly applied during Murtishaw's penalty retrial resulting in an *ex post facto* violation and erroneous jury instructions that constituted constitutional error that cannot be deemed harmless. We therefore reverse the order of the district court insofar as Murtishaw's death sentence is concerned, and remand to the district court with instructions to grant the writ to the extent that the death penalty sentence is vacated and a sentence of life imprisonment without parole is substituted unless the State resentences him within a reasonable time.

AFFIRMED in part; REVERSED in part; and REMANDED.